# 23-1013

## United States Court of Appeals
## for the Second Circuit



UNKECHAUG INDIAN NATION and HARRY B. WALLACE,

*Plaintiffs-Appellants,*

-against-

NEW YORK STATE DEPARTMENT OF ENVIRONMENTAL
CONSERVATION and BASIL SEGGOS in his official capacity as
the commissioner of the New York State Department of
Environmental Conservation,

*Defendants-Appellees.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NEW YORK

## BRIEF FOR PLAINTIFFS-APPELLANTS

LAW OFFICE OF JAMES F. SIMERMEYER, P.C.
JAMES F. SIMERMEYER, ESQ.
*Attorneys for Plaintiffs-Appellants*
445 Broad Hollow Rd, Suite 25
Melville, NY 11747
(347) 225-2228
*james@simermeyer.com*

# <u>TABLE OF CONTENTS</u>

*Page*

Table of Authorities.................................................................................iv

Preliminary Statement...............................................................................1

Jurisdictional Statement............................................................................1

Statement of the Issues..............................................................................2

     Whether the lower court erred in granting the Defendants-
     Appellees' Motion for Summary Judgment, Dismissing Plaintiffs-
     Appellants' claims by failing to properly consider all of the
     Evidence available to the court..........................................................2

       1.  Failure to Decide on the Daubert Motions
          (*Daubert v. Merrell Dow Pharm., Inc.* (509 U.S.
          579 (1993) or Rule 702 Motion) and applying
          the proper standards in making a ruling on the
          Andros-Unkechaug Treaty as set forth in
          Plaintiffs' Expert Report by John Strong, PhD. .............................2

       2.  Failure to Decide the Daubert Motions and not
          using expert testimony in the court's
          determination for the validity of the NYSDEC
          Environmental Regulations against Unkechaug
          fishing rights without considering the
          Admissions by Toni Kerns and the testimony of
          Plaintiffs'' Expert Fredrick Moore, Erred in the
          Reliance on *N.Y. Ex Rel. Kennedy v. Becker*, 241
          U.S. 556, 563, 3s S. Ct. 705, 707 (1916) and
          failed to apply *United States v. Washington*, 384
          F. Supp. 312, 316-37 (W.D. Wash 1974) .........................................2

3.  The District Court failed to properly consider
    the historical documentary evidence to properly
    rule on the New York State Colonial
    Relationship to New York State Indians. The
    Court erred in its interpretation of the New York
    State Constitution, Article 1 Section 14.
    (Historical Documents from New York State on
    this Issue) ................................................................2

4.  The Court erred in determining the limits of
    Plaintiffs customary fishing claims by failing to
    consider the testimony of Harry B. Wallace and
    the expert testimony of John Strong, PhD. .......................2

5.  The Court erred by not ruling on the Documents
    claimed to be privileged by the Defendants and
    challenged by the Plaintiffs. (A929 L. 2-A930
    L.1-L16, A959-A960, A36-A901, A902).........................2

Statement of Procedural History and Undisputed Facts ............................2

Argument.........................................................................................3

   Whether the Lower Court erred in granting the
   Defendants-Appellees' Motion for Summary
   Judgment, dismissing Plaintiffs claims by failing to
   properly consider all of the evidence available to
   the court. ................................................................3

   Standard of Review.............................................................. 3

   Standard of Review for Cross-Motions for Summary Judgment ..........3

   Standard of Review of an Indian Treaty................................4

      I.    Indian-Understanding Canon...........................................6

      II.   Liberal-Construction Canon ............................................6

   Expert Analyses of Andros-Unkechaug Treaty ....................................7

ii

The District Court Improperly Cited to Defendants-Appellees'
Expert without ruling on Plaintiffs' and Defendants' Daubert
Motions ................................................................................11

Lower Court failed to consider the Unkechaug American Eel
Management Plan and the NYSDEC Commissioner's Policy
CP-42 ...................................................................................14

The Lower Court's Application of the Supreme Court Holding
In *People of the State of New York Ex Rel Kennedy v. Becker*,
241 U.S. 556 (1916) is inapplicable to the Case at bar. ......................18

The Lower Court failed to make an *in-camera* ruling on
Defendants-Appellees' privileged documents thereby prejudicing
and violating Plaintiffs-Appellants' Due Process................................20

The Lower Court's use of Chief Wallace's Testimony
was taken out of context instead of using the evidence
submitted in the Declarations of Chief Wallace and
Dr. John A. Strong, PhD ....................................................22

The Lower Court misapprehended the law and failed to consider
Plaintiffs' Documentary Evidence establishing the Andros
Treaty valid under Federal Law and State Law ...............................24

Conclusion ............................................................................30

# TABLE OF AUTHORITIES

*Federal Case Law*                                                        *Cases*

*Application of Eisenberg*,
654 F.2d 1107, 1112 (5th Cir. 1981) .......................................................21

*Ass'n for Reduction of Violence v. Hall*,
734 F.2d 63, 67-68 (1st Cir. 1984) .........................................................22

*Bane v. Spencer*,
393 F.2d 108 (1st Cir. 1968)...................................................................21

*Deeks v. United States*,
04-580C, 2005 WL 6112655, at *3 (Fed. Cl. Feb. 18, 2005) .................24

*Fund for Animals v. Kempthorne*,
538 F.3d 124,131 (2d Cir. 2008) ...............................................................3

*Gristede's Foods, Inc. v. Unkechauge Nation*,
 660 F. Supp. 2d 442 (E.D.N.Y. 2009) .................................................2, 7

*Oneida India Nation of New York v. State of N.Y.*,
 860 F.2d 1145, 1155 (2d Cir. 1988) .......................................................24

*Seneca Nation of Indians v. New York*,
382 F.3d 245, 258 (2d Cir. 2004) .........................................................3, 5

*United States V. Washington*,
384F. Supp. 312, 316-37 (W.D. Wash 1974) ......................................2, 19

*United States v. Washington*,
853 F.3d 946, 967 (9th Cir. 2017) ...........................................................30

*Wachovia Bank, Nat. Ass'n v. VCG Special
Opportunities Master Fund, Ltd.*,
661 F.3d 164, 171 (2d Cir. 2011) ..............................................................4

*Heublein, Inc. v. United States*,
996 F.2d 1455, 1461 (2d Cir. 1993) ...........................................................4

*Supreme Court Cases*

*Choctaw Nation of Indians v. United States*,
318 U.S. 423, 432, 87 L. Ed. 877, 63
S. Ct. 672, 97 Ct. Cl. 731 (1943) ...........................................................................4, 5

*Daubert V. Merrell Dow Pharm., Inc.*
(509 U.S. 579 (1993)...................................................................................................2

*Fairfax' s Oevisee v. Hunter's Lessee*,
7 Cranch 603 (1813) .................................................................................................25

*Herrera v. Wyoming*,
139 S. Ct. 1686, 1699 (2019).................................................................................5, 27

*State of New York ex rel. Kennedy v. Becker*,
241 U.S. 556 (1916)........................................................................................2, 18, 19

*The Trustees of Dartmouth College v. Woodward*,
17 U.S. 518, 644-650 (1819) ...................................................................................25

*Tulee v. Washington*,
315 U.S. 681, 684 (1942)..........................................................................................5, 6

*Wash. State Dep't of Licensing v. Cougar Den, Inc.*,
139 S. Ct. 1000 (2019) ...............................................................................................5

*Washington v. Wash. State Commercial Passenger Fishing Vessel Ass'n*,
 443 U.S. 658, 99 S. Ct. 3055 (1979)........................................................................5, 6

*Minnesota v. Mille Lacs Band of Chippewa Indians*,
526 U.S. 172, 196, 143 L. Ed. 2d 270, 119 S. Ct. 1187 (1999).......................5, 6, 30

*Oneida Indian Nation v. Cty. of Oneida*,
414 U.S. 661, 94 S. Ct. 772 (1974)............................................................................5

***Federal Statutes and Rules***

FRE 702 ...................................................................................................2

***New York State Constitution***

N.Y.S. Constitution, Art. 1, Sec. 14 ...........................................................2

***U.S. Constitution***

U.S. Constitution, Art. VI ........................................................................24

## PRELIMINARY STATEMENT

The Plaintiffs-Appellants in this case seek to protect Unkechaug Indian Nation's fishing rights and enjoin the New York State Department of Environmental Conservation and commissioner, Basil Seggos, Defendants-Appellees from interfering with Unkechaug Treaty rights, preempted by federal law, to fish on their reservation lands and in customary waters. The Unkechaug fishing rights asserted are not exclusive and do not seek prohibiting others' right to fish and does not seek restricted control or ownership. The customary waters of the Unkechaug are limited to their historical fishing and hunting area as described by Dr. Strong and Chief Wallace. (See Complaint A15-A29, A5403 § ¶25)

Plaintiffs-Appellants' appeal from the Opinion and Order of the Honorable William F. Kuntz, II that was entered on June 16, 2023 granting defendants' motion for summary judgment and denying the plaintiff's motion for summary judgement and from the final judgement entered on June 20, 2023. (SPA1-SPA41)

## JURISDICTIONAL STATEMENT

The district court had federal question jurisdiction pursuant to 28 U.S.C. § 13313. This court has appellant jurisdiction pursuant to 28 U.S.C. § 1291 to hear an appeal of the final judgement entered by the lower court on June 20, 2023. Appellants timely filed a notice of appeal on July 12, 2023. (SPA42) The appeal is from a final judgement that disposes of all Appellants' claims.

1

## STATEMENT OF ISSUES

**I.     WHETHER THE LOWER COURT ERRED IN GRANTING THE
       DEFENDANTS-APPELLEE'S MOTION FOR SUMMARY
       JUDGEMENT, DISMISSING PLAINTIFFS-APPELLANTS'
       CLAIMS BY FAILING TO PROPERLY CONSIDER ALL OF THE
       EVIDENCE AVAILABLE TO THE COURT:**

*1.     Failure To Decide On The Daubert Motions (Daubert V. Merrell Dow
Pharm., Inc. (509 U.S. 579 (1993) Or Rule 702 Motion) And Applying The
Proper Standards In Making A Ruling On The Andros-Unkechaug Treaty As Set
Forth In Plaintiffs' Expert Report By John Strong, Phd.*

*2.     Failure To Decide The Daubert Motions And Not Using Expert Testimony
In The Court's Determination Of The Validity Of The NYSDEC Environmental
Regulations Against Unkechaug Fishing Rights Without Considering The
Admissions By Toni Kerns And The Testimony Of Plaintiffs' Expert Frederick
Moore. Erred In The Reliance On N.Y. Ex Rel. Kennedy V. Becker, 241 U.S. 556,
563, 36S. Ct. 705,707 (1916) And Failed To Apply United States V. Washington,
384F. Supp. 312, 316-37 (W.D. Wash 1974).*

*3.     The District Court Failed To Properly Consider The Historical
Documentary Evidence To Properly Rule On New York States Colonial
Relationship To New York State Indians. The Court Erred In Its Interpretation
Of The New York State Constitution, Article 1 Section 14. (Historical Documents
From New York State On This Issue;)*

*4.     The Court Erred In Determining The Limits Of Plaintiffs' Customary
Fishing Claims By Failing To Consider The Testimony Of Harry B. Wallace And
The Expert Testimony Of John Strong, PhD.*

5.     *The Court Erred By Not Ruling On The Documents Claimed To Be
Privileged By The Defendants And Challenged By The Plaintiffs.* (A929 L. 25-
A930 L.1-L.16, A959-A960, A36-A901, A902)

## STATEMENT OF PROCEDURAL HISTORY AND UNDISPUTED FACTS

The Unkechaug Indian Nation is a state and federal Indian Nation, (*Gristede's*

*Foods, Inc. v. Unkechauge Nation*, 660 F. Supp. 2d 442 (E.D.N.Y. 2009) and

2

N.Y.S. Indian Law § 2) and Harry B. Wallace is a blood right member of the

Unkechaug Indian Nation and a duly elected Chief of the Nation.

The New York State Department of Environmental Conservation is part of the New

York State government and Commissioner Basil Seggos was appointed by the New

York State governor.

## ARGUMENT

### WHETHER THE LOWER COURT ERRED IN GRANTING THE DEFENDANTS-APPELLEES' MOTION FOR SUMMARY JUDGEMENT, DISMISSING PLAINTIFF'S CLAIMS BY FAILING TO PROPERLY CONSIDER ALL OF THE EVIDENCE AVAILABLE TO THE COURT:

### STANDARD OF REVIEW

"We review de novo a district court's ruling on cross motions for summary

judgment, in each case construing the evidence in the light most favorable to the

non-moving party." *Fund for Animals v. Kempthorne*, 538 F.3d 124,131 (2d Cir.

2008) (internal quotation marks omitted). This Court reviews a district court's

grant of summary judgment de novo, construing the evidence in the light most

favorable to the non-moving party. *Seneca Nation of Indians v. New York*, 382 F.3d

245, 258 (2d Cir. 2004) "Summary judgment is appropriate where there exists no

genuine issue of material fact and, based on the undisputed facts…".

### STANDARD OF REVIEW FOR CROSS-MOTIONS FOR SUMMARY JUDGMENT

The standard for summary judgment does not change when both sides file cross-motions seeking the same relief. "When each side has moved for summary judgment, the district court in entertaining the motions—and the court of appeals in reviewing the district court's decisions—are required to assess each motion on its own merits and to view the evidence in the light most favorable to the party opposing the motion, drawing all reasonable inferences in favor of that party." *Wachovia Bank, Nat. Ass'n v. VCG Special Opportunities Master Fund, Ltd.*, 661 F.3d 164, 171 (2d Cir. 2011) (citations omitted). "[W]hen both sides move for summary judgment, neither side is barred from asserting that there are issues of fact, sufficient to prevent the entry of judgment, as a matter of law, against it. When faced with cross-motions for summary judgment, a district court is not required to grant judgment as a matter of law for one side or the other." *Heublein, Inc. v. United States*, 996 F.2d 1455, 1461 (2d Cir. 1993) (citation omitted).

## STANDARD OF REVIEW OF AN INDIAN TREATY

Generally, treaties are construed more liberally than private agreements and the history, negotiations, and practical construction adopted by the parties are all relevant to treaty interpretation. Moreover, Indian treaties "are to be construed, so far as possible, in the sense in which the Indians understood them." *Choctaw Nation of Indians v. United States*, 318 U.S. 423, 432, 87 L. Ed. 877, 63 S. Ct. 672,

4

97 Ct. Cl. 731 (1943*); see also Minnesota v. Mille Lacs Band of Chippewa Indians*, 526 U.S. 172, 196, 143 L. Ed. 2d 270, 119 S. Ct. 1187 (1999). In particular, they should be construed "liberally in favor of the Indians, with ambiguous provisions interpreted to their benefit." *Oneida I*, 470 U.S. at 247. *Seneca Nation of Indians v. New York*, 382 F.3d 245, 259 (2d Cir. 2004)

A treaty is "essentially a contract between two sovereign nations." *Fishing Vessel Assn.*, 443 U. S., at 675, 99 S. Ct. 3055, 61 L. Ed. 2d 823. Indian treaties "must be interpreted in light of the parties' intentions, with any ambiguities resolved in favor of the Indians," *Mille Lacs*, 526 U. S., at 206, 119 S. Ct. 1187, 143 L. Ed. 2d 270, and the words of a treaty must be construed "'in the sense in which they would naturally be understood by the Indians,'" *Fishing Vessel Assn.*, 443 U. S., at 676, 99 S. Ct. 3055, 61 L. Ed. 2d 823.*Herrera v. Wyoming*, 139 S. Ct. 1686, 1699 (2019) Beyond the text, the historical context and the treaty negotiations are "central to the interpretation of treaties." *Millie Lacs Band*, 526 U.S. at 202. See *Herrera*, 139 S. Ct. at 1702 (looking to "the treaty's text and the historical record"). *Washington State Dep't of Licensing v. Cougar Den, Inc*., U.S., 139 S. Ct. 1000, 1019 (2019) (Gorsuch, J., concurring). A court interpreting an Indian treaty "must not give the treaty the narrowest construction it will bear." *Tulee v. Washington*, 315 U.S. 681, 684 (1942). Far from a four-corners analysis, the Supreme Court has oft repeated the rule that "it is the intention of the parties," and

particularly tribal intent that controls a treaty's meaning. *Washington v. Was. State Commercial Passenger Fishing Vessel Ass'n*, 443 U.S. 658, 675 (1979 (citing cases); see also *Tulee, 315 U.S. at 684* ("it is our responsibility to see that the terms of the treaty are carried out, so far as possible, in accordance with the meaning they were understood to have by the tribal representatives at the council")

### I.  *Indian-understanding canon*

The Indian-understanding treaty-interpretation canon request this court to look beyond the written words to the larger context that frames the Treaty, including the history of the treaty, the negotiations, and the practical construction adopted by the parties.

### II.  *Liberal-Construction canon*

Under a separate treaty-interpretation canon, if, after review of the historical record, it is unclear what meaning treaty negotiators (and particularly, tribal negotiators) afforded to a treaty, then "Indian treaties are to be interpreted liberally in favor of the Indians" and "any ambiguities are to be resolved in their favor." *Millie Lacs*, 526 U.S. at 200 (citing cases and resolving "plausible ambiguity" in

Judge William F. Kuntz II, failed to apply any of these canons or considerations when deciding on the Andros Treaty. In fact, Judge Kuntz failed to even use the Expert Report of the most pre-eminent ethno-historian of Long Island Indians, Dr.

6

John Strong, PhD. In the Argument below Plaintiffs-Appellants will expand on this argument and how the District Court totally disregarded the required analysis and understanding of the historical context of the signing of the treaty and failed to apply any ambiguities within the Andros Treaty in the favor of the Indian.

### EXPERT ANALYSES OF ANDROS-UNKECHAUG TREATY

John A. Strong, PhD. is the pre-eminent ethno-historian on Long Island Indians and their interactions and government to government relationship with the colonial governments of Dutch, English, and New York Colony. Dr. Strong's experience, studies, and peer reviewed books, academic journal articles, and conference papers are world renowned and are based on the current methodology of ethnohistorians around the world. (See Strong Resume A5517-A5525)

In *Gristede's Foods, Inc. v. Unkechauge Nation*, 660 F. Supp. 2d 442, 446-47 (E.D.N.Y. 2009) Dr. Strong's experience, knowledge, and testimony as an Expert Ethnohistorian was accepted by District Court Judge Kyio Matsumoto.

Dr. Strong's methodology in his expert report submitted in this case makes a detail showing of the historical, political, and cultural context of the time of the signing of the Andros Treaty (A4742-A4746) and compares the 1676 Andros Treaty with several previous agreements, Treaties and land grants, all of which always retained by the Long Island Indian Nation's right to plant, fish and hunt. (Strong Report A5493-A5503)

Plaintiffs' expert Dr. Strong explains why Governor Andros would appease the

Unkechaug by entering a Treaty with the tribe because of the fear of the Long

Island Indians joining with the New England Indians and revolting against the

settlers of Long Island, the consideration for the treaty. (See Strong Report A5505-

A5515, Strong Declaration A4783-A4785)

In Dr. Strong's Report, he articulately explains the complex historical backdrop

around May of 1676 and why Andros would enter negotiations with the

Unkechaug:

> The contentions which were at play in the spring of 1676 did not emerge out
> of a vacuum, they were rooted in a tumultuous history involving three
> international confrontations resulting in regime changes, a plot by an
> adventurer named John Scott to make himself "president of Long Island," a
> major Indian war which nearly wiped out the New England settlements and
> threatened to spread to Long Island, an armed stand-off between Connecticut
> and New York militias over colonial borders, an attempt by Native American
> whalers to form their own whaling companies to compete with the English
> owned companies, and a plot by the of eastern Long Island to remove
> themselves from the jurisdiction of New York and join Connecticut. It was
> against the backdrop of these events that Governor Andros and the
> Unkechaug met in May 1676 to negotiate the Anglo-Unkechaug Treat.
>
> (See Strong Report A5497)

Dr. Strong testified similarly in his deposition testimony by Defendant-Appellees.

(See Strong Deposition A5532-A5533)

With the historical context explained by Dr. Strong, it is evident that Governor

Andros feared that the Unkechaug would become hostile and join forces with the

Indians from New England and encompass Long Island into King Phillips war; therefore, Governor Andros in consideration of Unkechaug peace, agreed that the English subjects should not interfere with the Unkechaug and their fishing and whaling rights. Judge Kuntz's decision fails to analyze or take this historical context in deciding on the validity of the treaty contrary and inconsistent with Supreme Court and 2nd Circuit precedent. (See Section Standard of Review of Indian Treaties above)

Additionally, Judge Kuntz failed to analyze Dr. Strong's report, testimony or declaration and took Attorney Thompson's declaration and lawyer talk as definitive to interpreting a treaty rather than delving into the Historical, political, and cultural context required to understand the lexicon and language of the time. Judge Kuntz painted a broad stroke between all Indian Nations however each Indian Nation is unique to its own location and understanding. (See Decision SPA28-SPA29) Additionally, Judge Kuntz mischaracterized the language of the Andros treaty and defines it with the present understanding of "law and Custom", "Order in Council", "Mere Privilege".

Dr. Strong clearly explains what the meaning of those terms meant in Long Island and how the English in Long Island and the Unkechaug would have understood those terms within the Andros Treaty to mean.

May 24, 1676: The Treaty

9

"Resolved and ordered" at Council in New York "Upon the request of
Indians of Unkechaug upon Long Island that they may have the liberty to
whale and fish upon their own account." "That they are at liberty and may
freely whale or fish or with Christians or by themselves and dispose of their
effects as they think good according to the law and custom of the
government of which all magistrates officials or others whom this may
concern are to take notice and suffer the said Indians so to do without any
manner of let hindrance or molestation they comporting themselves civilly
and as they ought."
(Strong Report A5514)

This treaty was a part of a continuing diplomatic relationship between two
sovereigns that established the rights of the Unkechaugs to harvest the
bounty of their maritime environment as they had for thousands of years. It
was an agreement between two sovereigns which served both of their
interests, meeting the classic definition of a treaty between nations as
defined by Hugo Grotius. Although Andros was viewed by some historians
as autocratic, he nevertheless proved to be a skillful negotiator when he met
with the Unkechaug sachems over the two days of meetings in May (Dunn
1956, 21; Ritchie 1977, 94). His sympathetic understanding of Algonquian
rights was again displayed a decade later during his administration of the
New England Confederation. For the Unkechaug, justice was satisfied in
accordance with Algonquian custom "by
putting the world back in balance" (Hermes 2008, 41).
(Strong Report A5515)

The District Court failed to rule on both parties' Daubert motions which precluded

Judge Kuntz from fully examining all the evidence and understanding its proper

weight. The sole Historical Expert in the case that could assist the court to

understand this nuanced and ancient terminology was ignored by the Justice Kuntz.

The terminology and choice of words in the Andros Treaty cannot be defined by

today's definitions or compared to other Indian Tribes Treaties located in other

parts of what is now the United States. The Court failed to consider all the

10

Plaintiff's evidence thereby prejudicing Plaintiff. Additionally, by not ruling on

Daubert or analyzing expert, Dr. John Strong, PhD's Report and testimony, the

Court violated Plaintiffs-Appellant's due process rights. Furthermore, by the Court

not considering the historical context, proves that Judge Kuntz failed to properly

apply Indian Canon of interpretation in his analysis of the Andros-Unkechaug

Treaty of May of 1676.[1] The only remedy for the Plaintiffs is for the 2nd Circuit to

reverse the District Court's Decision and Judgment and remand back to Judge

Kuntz with instructions for the District Court to rule on the Daubert Motions and

to properly apply the Indian Canons when interpreting the treaty. In following case

law that mandates the analysis in Plaintiffs-Appellant's expert evidence, the Court

ignored its obligations and did not apply the appropriate standards of review in

deciding the Summary Judgment motions. Furthermore, Plaintiffs-Appellants

presented more than enough evidence to prove that genuine issues of fact exist.

### THE DISTRICT COURT IMPROPERLY CITED TO DEFENDANTS-APPELLEES' EXPERT WITHOUT RULING ON PLAINTIFFS' AND DEFENDANTS' DAUBERT MOTIONS

The lower court cited to Defendants-Appellees' expert witness Kerns throughout

his decision without ruling on the Daubert motions of both parties and considering

---

[1] The lower court improperly ruled on 25 USC §232 because they did not review all off Plaintiffs' evidence and apply proper standards when interpreting the treaty; the two arguments are interconnected and the limiting clause prevents New York State from enforcing its regulation against Indian Treaty Rights.

Plaintiffs-Appellants' arguments on why Defendant-Appellees expert's opinion

should not be considered. (See Kuntz Decision SPA2-SPA4)

Judge Kuntz' reliance on the Declaration of an Expert Witness in the lower court's

decision is improper and prejudicial to the Appellants. Prior to use of Defendant's

expert Toni Kerns, Judge Kuntz would have had to first rule on the fully briefed

Daubert motions. (See A1001-A1002) [2]

Plaintiffs-Appellant's argued that defendant's expert, Toni Kerns, testimony

should have been precluded based on the following:

1.      That Ms. Kerns is biased because of her employment relationship with
Atlantic States Marine Fisheries Commission (ASMFC) and NYSDEC; and
2.      That Toni M. Kern's reliance on anecdotal information by third parties
makes her report and testimony unreliable; and

3.      That Ms. Kerns is not qualified through her education, experience, and
knowledge to be an expert on the American Eel; and
4.      That Ms. Kerns has little or no credibility because she misrepresented facts
relating to her report, pay and preparation for her expert testimony on behalf of the
NYSDEC. (A1172-A1263)

The lower court avoided addressing plaintiff's Daubert Motions and never ruled on

Plaintiff's arguments (See Pl' Brief A1178) and the Defendant's Expert witness's

admissions on the arbitrary and capricious regulations concerning the American eel

fishing by the public. The New York State Department of Conservation

---

[2] The lower court failed to consider Plaintiffs' expert, Fredrick Moore who was plaintiffs' expert on conservation, Native religion and its relationship to fishing as acknowledged in CP-42 §D §3. Because the lower court failed to decide on Daubert and consider all of Plaintiffs' evidence the Court should reverse and remand for further determination and specifically reverse the denial of Plaintiffs' Freedom of Expression of Religion claim.

("NYSDEC") rules permitted the American Eel to be caught if it was 9-inch or

longer is arbitrary and capricious.

Q. And would it make any difference if
   If a –if one of the American Eels was destroyed
   At one safe of life or other stages of its
   Life as far as its ability to reproduce?
A. Mortality on a pre-spawn eel is
   Mortality, so any eel that doesn't survive is an
   Eel that will not be able to spawn.
   (Pl Smj Brief A3109 and Kerns Dep. A4140 L.4-L.10)

Ms. Kearns admitted that the death of eels at any stage of their life cycle when they

are pre-spawn age resulted in the loss of population and future population of the

American Eel, accordingly there is no distinction in permitting fishing of a specific

size eel over another size of a pre-spawn eel. Unless the eel can spawn the

population will be reduced. Accordingly, the regulation that allows the fishing of a

nine-inch eel over a three-inch eel is meaningless and an arbitrary and capricious

rule. (A4651-A4652)

The lower court ruled on the conservation Necessity Principle without even

considering this admission and arbitrary and capricious nature of enforcement of a

size limit of the American Eel. (See Kuntz Decision SPA32)

Equally arbitrary is the NYSDEC statute that allows for any recreational

fisherperson to fish eels over nine inches and permitted to fish up to twenty-five at

a time and party boats are allowed fifty catches at a time. The permitted catches are

allowed for bait and not even limited to human consumption. (A4652) Kerns states

the following:

> There is recreational fishing Management measures, as well as commercial
> Measures. There is     still a nine-inch minimum Size limit for the
> recreational fishermen. They Are permitted to take 25 eel at a time. And the
> For-hire industry, so a party boat or a charter Boat, someone that you would
> pay to go out on Their vessel and fish for the day, those – those Vessels are
> allowed to have 50 eel on them at a Given time.
> Q. And the 25 eel limitation, that's for Each individual in New York State,
> correct?
> A. It's, yeah, 25 eel per person.
> Q. Okay. So if a million people wanted to fish for eels in New York, that
> would be 25 Million eels that would be fished by – by New Yorkers
> pursuant to that law, correct?
> A.That is correct. They have to be nine Inches, yes, if they its in  recreational
> Fishing, yes.
>
>               (Kerns Dep. A4138 P.89 L.3-L.22)

The illogical prohibition by NYSDEC against the Unkechaug does not serve as a

valid conservation measure in light of the fact that their rules allow for any

recreational fishing to remove 25 and commercial fishers to take up to 50 eels over

9 inches. If one million New York residents fished for eels, they could deplete the

eel population by twenty-five million in New York alone under this arbitrary rule.

(See Pl. Brief SMJ. A4652)

This evidence was totally ignored by the lower court and should have been

considered because it creates a genuine issue of fact that would require a trial.

## LOWER COURT FAILED TO CONSIDER THE UNKECHAUG AMERICAN EEL MANAGEMENT PLAN AND THE NYSDEC COMMISSIONER'S POLICY CP-42

The lower court failed to properly evaluate the evidence submitted by the

Plaintiffs in summary judgment motion. The Plaintiffs submitted the Unkechaug

American Eel Management plan that was sent as far back as the year 2015 to the

NYSDEC who failed to cooperate or work with the Unkechaug Nation in

accepting the management plan because it preserved the American Eel better than

the NYSDEC conservation laws and regulations can protect the American Eel

Species. (A4653-A4659, CP-42 A3205-A3211, Man. Plan. A4093-A4109)

NYSDEC Commissioner's Policy 42 (A3205-A3211) requires the NYSDEC to

deal with Native American Nations in the following ways. This policy requires

cooperation, and consultation with Indian Nations and creates a policy to interact

with Native Nations in good faith and to acknowledge their treaties and beliefs.

CP-42 states the following:

> II. POLICY
> It is the policy of the Department that relations with the Indian Nations shall
> be conducted on a government-to-government basis. The Department
> recognizes the unique political relations based on treaties and history,
> between the Indian Nation government and the federal and state
> governments. In keeping with this overarching principle, Department staff
> will consult with appropriate representatives of Indian Nations on a
> government-to-government basis on environmental and cultural resource
> issues of mutual concern and, where appropriate and productive, will seek to
> develop cooperative agreement with Indian Nations on such issues.
> (A3206)
>
> 2. Hunting, Fishing, and Gathering
> The Department recognizes that hunting, fishing, and gathering are activities
> of cultural and spiritual significance to the Indian Nations. The Department

is committed to collaborating with Indian Nations to develop written
cooperative agreements that protect the rights of such Nations to engage in
these activities consistent with the Department's interest in protection and
management of the State's natural resources.
 (A3210)

The lower court failed to consider this important policy when deciding on the

conservation necessity and whether defendants were interfering with Unkechaug

Sovereignty rather than complying with CP-42 and working together with the

Unkechaug government in good faith.

The Unkechaug American Eel Management Plan preserves the American Eel

better than defendants' plan. Plaintiff submitted its plan and the following passages

from the Unkechaug management plan.

 2.2 Increase in wild caught stocking effort.
   A. Commencing with the 2014 glass eel fishing season, no less than 10% of all
      glass eels harvested by the Unkechaug Indian Nation, shall immediately be
      placed directly above artificial barriers to passage of glass eels to historic
      American eel habitat and
   B. During each subsequent fishing year thereafter, the Unkechaug Indian
      Nation shall require an additional 10% of glass eels harvested by the
      Unkechaug Nation to be stocked in accordance with the provisions
      established under Section 2.1 or until the nation has attained its goal of 50%
      stocking of wild caught glass eels into bodies of waters beginning nearest to
      the Unkechaug Indian Nation territory, then
   (A4104)Defendant's expert witness, Toni Kerns validated the Unkechaug

      method of removing the glass eels and placing them above destructive

      barriers. Ms. Kerns states:

      A. There are many different passage techniques that are out and available.
      You know, I think some studies have shown that certain types of passage
      works better in certain conditions than others, and so we provide information

16

on a lot of different types of passage that you can use to help get eels over
dams and culvers and impediments to water ways.
   (A1440 P.95 L.14-L.21)

Plaintiffs' evidence and admission by defendant's expert makes it is clear that the

Unkechaug method of preserving the American Eel is specific and comprehensive

by allowing for co management rather than management by enforcement of

arbitrary size regulations. Simply put, the NYSDEC's regulation is not a necessity

to preserve the eel population but it is subjective rules and based on selective

enforcement that has infringed on the Unkechaug's inherent right to fish. The

Unkechaug Management plan is thoughtful and inclusive and calls for cooperation

with regulatory agencies such as the NYSDEC or other commercial fisheries.

The lower court should have weighed this important evidence in consideration of

whether there was a conservation necessity. The court should have also considered

the CP-42 policy of NYSDEC and that the defendants acted in bad faith in dealing

with the Plaintiffs. Failure to rule on the Daubert motions by Judge Kuntz resulted

in the denial of due process and ignores genuine issue of facts that requires a trial.

Defendants-Appellees and their expert, Ms. Kearns never read the Unkechaug

management plan. Judge Kuntz failed to consider the Unkechaug management plan

in his decision although it was central to the conservation issues in the case. (See

Kuntz Decision SPA1-SPA40, Gilmore Dep. A4197-A4223, Florence DepA4224-

A4263, Kreshik Dep.A4267-A4294, Berkman Dep. A4295-A4319 Ex 28, Seggos

Dep. A4320-A4343, See Pl. Brief. SMJ A3117-A3136)

The overwhelming evidence submitted by plaintiffs on summary judgment should

have been considered by the court in conjunction with the Daubert motions to

properly weigh all the evidence and not prejudice either party. Because the lower

court failed to consider all of Plaintiff's evidence and failed to rule on the Daubert

motions, the lower court's decision must be reversed and remanded back to the

lower court.

**THE LOWER COURT'S APPLICATION OF THE SUPREME COURT HOLDING IN *PEOPLE OF THE STATE OF NEW YORK EX REL KENNEDY V. BECKER*, 241 U.S. 556 (1916) IS INAPPLICABLE TO THE CASE AT BAR**

The Lower court incorrectly applies the Supreme Court precedent in the People of

the *State of New York ex rel. Kennedy v. Becker*, 241 U.S. 556 (1916) to the case at

bar because the case deals with the Seneca Tribe and an entirely different treaty.

(Kuntz Decision SPA 33) The Andros Treaty reserved an Unkechaug right and not

a mere privilege as distinguished by the Supreme Court, that the Seneca had a

reserved privilege in reservation hunting and fishing rights.

The lower court applies an outdated case based on Supreme Court language that

illustrates social Darwinism at its worst.

> The plaintiffs in error put it: "The land itself became thereby subject to a
> joint property ownership and the dual sovereignty of the two peoples, white
> and red, to fit the case intended, however infrequent such situation was to

be." We are unable to take this view, It is said that the State would regulate the white and that the Indian tribe would regulate its members.
N.Y. ex rel. Kennedy v. Becker, 241 U.S. 556,563, 36 S.Ct., 703, 707 (1916)

The Supreme Court nixed a reserved treaty right to protect the "whites" ability to

control the hunting and fishing of the off-reservation land contrary to the Treaty of

Big Tree.

The more recent case that distinguished this ruling, but was not considered by

Judge Kuntz. *United States v. Washington*, 384 F. Supp. 312, 336-37 (W.D. Wash.

1974) The distinction was explained:

> Most significant of all, it is stated in the very *Kennedy* language quoted in Puyallup-I (391 U.S. pp. 399-400, 88 S. Ct. p. 1729) that the fishing clause in the treaty conveyance "is fully satisfied by considering it a reservation of a *privilege* of fishing…" subject to state regulation. If at this time anything concerning treaty fishing rights should be beyond doubt or question it is the basic principle that the treaty fishing of plaintiff tribes in this case is a reserved *right* and not a *mere privilege*. The treaty fishing in Kennedy was held to be only a *privilege* under the peculiar facts of that case. Northing faintly comparable to those facts can be found in either Puyallup-I or the present case.
> *United States v. Washington*, 384 F. Supp. 312, 336-37 (W.D. Wash. 1974)

The case at bar is not a habeas petition and is similar to the Washington case. The

Andros Unkechaug Treaty was meant to be a reserved right for the Unkechaug not

a reserved privilege. Washington correctly points out that the language in Puyallup

should have been applied by Judge Kuntz in the Andros Treaty, "it is the basic

principle that the treaty fishing of plaintiff tribe in this case is a reserved *right* and

not a *mere privilege Puyallup-I* Id."

19

The lower court failed to properly analyze and consider plaintiff's argument in its

opposition brief and its analysis resulted in a misapprehension of the law and facts.

This is another example of the lower court not considering all of Plaintiffs'

evidence (A4643-A4645) when deciding the summary judgment motion. Proper

consideration of the plaintiffs' evidence by Judge Kuntz would have exposed

genuine issues of fact that mandate a trial.

**THE LOWER COURT FAILED TO MAKE AN *IN-CAMERA* RULING ON DEFENDANTS-APPELLEES' PRIVILEGED DOCUMENTS THEREBY PREJUDICING AND VIOLATING PLAINTIFFS-APPELLANTS DUE PROCESS.**
      The lower court failed to make a ruling on the *in camera* documents the

court ordered defendants to turnover to the lower court. (A902)

Judge Kuntz stated on the record the following:

> " Okay, By 5:00 p.m. on May 10 (2019) I want all of the documents that are being withheld on privileged ground to be provided to the Court for in-camera review together with a privilege log. The privilege log will be provided to the defendants at the same time it is provided to the Court. You can provide it on ECF, and I will review the documents that are being withheld to determine whether or not they our to be produced in the litigation; whether the privileged that are being asserted, whether it is attorney/client, trade secrets, communicative, deliberative privilege, whatever the privileged ground is, please asset it and assert the statutory or rule basis for the privilege."

(A929 L. 25- A930 L.1-L.16) The defendants filed their privileged log on May 10,

2019. (A959-A960) The lower court failed to rule on the privileged documents as

stated on the Record. Therefore, Plaintiff's due process rights have been violated

because Judge Kuntz failed to evaluate the evidence that may have provided the

plaintiffs with additional evidence to be used in Summary Judgment.

Furthermore, because the lower court failed to make any *in-camera* decision we do

not know whether the Court reviewed the documents and used the knowledge of

those documents when deciding the cross-motions for summary judgment.

There is no case law where a lower court simply failed to make an *in-camera*

determination on privileged documents after stating he would do so. We simply do

not know what Judge Kuntz saw and relied on in deciding on the summary

judgment motions. Case law provides that the appellate court must reverse and

remand.

> *6 Moore's Federal Practice*, para. 56.11[1.-8] at 56-205 to 207 (1983)
> (footnotes omitted, emphasis added). Here, however, the district court
> apparently relied on documents which it had previously determined to be
> privileged and as to which it had denied plaintiffs' discovery motion.
> Although the circumstances are less egregious than *in Bane v. Spencer*, 393
> F.2d 108 (1st Cir. 1968), cert. denied, 400 U.S. 866, 27 L. Ed. 2d 105, 91 S.
> Ct. 108 (1970), where the defendant obtained summary judgment based on
> an affidavit incorporating impounded and nonproducible medical reports, id.
> at 109, we think that our holding in Bane clearly requires that the grant of
> summary judgment here be vacated and remanded. See id. at 110; cf. Jabara,
> 75 F.R.D. at 489 (making "abundantly clear" that in camera inspection
> conducted solely to determine discoverability and not "for the purpose of
> making any ex parte determination on the merits"). As the court in *Kinoy*
> noted:
> Our system of justice does not encompass ex parte determinations on the
> merits of cases in civil litigation. [If] the documents are privileged, [then]
> the litigation must continue as best it can without them . . . .
>
> 67 F.R.D. at 15. See also *Application of Eisenberg*, 654 F.2d 1107, 1112
> (5th Cir. 1981).

This court should follow case precedent mandating a reversal and remand of Judge

Kuntz', decision.

> We conclude that a remand is necessary. If the defendants renew their motion for summary judgment, the district court will have to rule on the motion without relying on any privileged materials. Therefore, in light of the foregoing discussion, the district court should begin by making a fresh determination of privilege based on an *in-camera* examination of the documents as to which privilege is claimed.
> Vacated and remanded.
> *Ass'n for Reduction of Violence v. Hall*, 734 F.2d 63, 67-68 (1st Cir. 1984)

For the following reasons this Court should reverse and remand to correct the *ex-*

*parte* determination of privileged documents.

## THE LOWER COURT'S USE OF CHIEF WALLACE'S TESTIMONY WAS TAKEN OUT OF CONTEXT INSTEAD OF USING THE EVIDENCE SUBMITTED IN THE DECLARATIONS OF CHIEF WALLACE AND DR. JOHN A STRONG, PhD.

The lower court's analyses of the Unkechaug Customary fishing waters are taken

out of context and the lower court does not consider, analyze, or even mention the

Declaration of Chief Harry B. Wallace and the Declaration of Dr. John A. Strong,

PhD.

The court cites a deposition transcript of Chief Wallace, (who was deposed twice,

individually and as Nation representative, for approximately fourteen hours), and

completely takes Chief Wallace's response to a question out of context. (See Kuntz

decision SPA24)

22

Plaintiffs submitted a Declaration of Chief Wallace in support of plaintiffs' Reply

to defendants' Opposition. (A5399-A5404,A5405-A5488)

Chief Wallace stated the following:

> As I stated in my previous affidavit and incorporated by reference in
> paragraph 15 and attached as Exhibit A-7 the Unkechaug traditional
> and customary waters are between the Namkee Creek and Apaucuck
> Creek. Attached is a google maps print out that is a true and correct
> copy that illustrates that area attached hereto as Exhibit A-12" (A5403
> ¶25, A5485, A5423-A5436)

Plaintiff's expert also stated what he believed to be the traditional fishing location

of the Unkechaug in his testimony when questioned by defendant's counsel; asking

him where the Unkechaug customary fishing waters were located. Dr. Strong stated

that it was between the Namkee Creek and Apaucock Creek. (A5045)

Plaintiffs later submit Dr. Strong's Declaration in opposition to defendants'

summary judgment and in Reply to Defendants' opposition of plaintiffs' Summary

Judgment motion. Dr. Strong confirms in his Declaration the following:

> The reference to the Unkechaug's "customary fishing waters" in my
> testimony is well documented. These waters run along the shore line of
> Unkechaug "Common lands." The western boundary was established in
> Chief Tobacus's grant to Governor John Winthrop Jr. of Connecticut in
> 1664, at Namkee Creek, near the present-day village of Patchogue in the
> town of Brookhaven (RTBH Hutchinson 1880, 23). The eastern boundary
> was set in an agreement between Governor Richard Nicolls and
> representatives from the Unkechaug and Shinnecock Nations during a
> meeting in New York a year later in October, 1665. The parties established it
> at Apaucock Creek near the present-day village of West Hampton (DSBD 2:
> 123-127) (A4782 and again confirmed A5490-A5491 ¶14-¶16, A5535)

23

Dr. Strong again confirms the boundaries of Unkechaug customary fishing waters in his Declaration in support of plaintiff's Reply to defendants' opposition to plaintiffs' Summary Judgment. Dr. Strong stated the same boundaries. (Dkt.118 and 118-5 Dec Strong ¶ 14-16)

Plaintiffs provided genuine issues of fact that requires a trial. The lower court erred by not considering evidence provided in plaintiffs' summary judgment motion.

The Unkechaug only seek a limited reserved non-exclusive right to fish within its customary fishing territory.

## THE LOWER COURT MISAPREHENDED THE LAW AND FAILED TO CONSIDER PLAINTIFFS' DOCUMENTARY EVIDENCE ESTABLISHING THE ANDROS TREATY VALID UNDER FEDERAL LAW AND STATE LAW

The lower court's argument that the Andros Treaty was not incorporated and ratified by reference to Article VI of the U.S. Constitution is unsound. (See Kuntz Decision P. 27) The lower Court relies on case precedent that are factually different and about different issues than the present case. (See *Deeks v. United States*, 04-580C, 2005 WL 6112655, at *3 (Fed. Cl. Feb. 18, 2005) (Braden, J.) (holding that Article XII of the Articles of Confederal protected creditors subsequently were included in United States Constitution via Article VI of the U.S. Constitution.)

The 2nd Circuit has ruled in *Oneida India Nation of New York v. State of N.Y.*, 860 F.2d 1145, 1155 (2d Cir. 1988) that "we do no doubt that treaties made during the

24

confederal period between the United States and Indian Nations are entitled to the same respect as treaties made with foreign nations and that both equally "became the supreme law of the land" by virtue of Article VI of the Constitution. This line of reasoning should be applied to the Andros and Unkechaug Treaty because this relationship has been maintained and accepted since May 24, 1676 until present.

The lower court's faulty logic and reasoning in its determination that the Andros Treaty was not incorporated by the U.S. Constitution is defeated by documentary evidence and case precedents. Courts have routinely upheld transactions that occurred prior to the formation of the United States as valid. Colonial documents are legally enforceable today under Federal Law. For example, Virginia' s property confiscation laws enacted prior to the present federal constitution as a commonwealth during and after the revolution was ruled unconstitutional. See: *Fairfax' s Oevisee v. Hunter's Lessee*, 7 Cranch 603 (1813). Dartmouth College 's Crown Charter was ruled not affected by the war of independence. *The Trustees of Dartmouth College v. Woodward*, 17 U.S. 518, 644-650 (1819) (Dartmouth' s 1769 charter, although granted by the Crown under the seal of the Province of New Hampshire, was nonetheless binding upon the State of New Hampshire as successor, and is a contract, the obligation of which cannot be impaired by the state without violating the contract clause of the federal constitution).

It is too clear to require the support of argument, that all contracts and rights respecting property, remained unchanged by the revolution. The obligations then, which were created by the charter to Dartmouth College, were the same in the new, that they had been in the old government.

*Dartmouth College*, 17 U.S., at 651 (Marshall, CJ.)

The United States of America acknowledges and accepts colonial treaties between

the English colonies and Indian Nations. The United States incorporated and

ratified preexisting agreements, by reference into the Constitution of the United

States when it indicated in Article VI. Sec (1).

"All…Engagements entered into, before the adoption of this Constitution shall be as valid as against the United States under the Constitution, as under the Confederation.

This doctrine was articulated by the Honorable Hosea Hunt Rockwell,

Representative from New York, and a member of the House Appropriations

Committee in 1892. In a well-known speech before the Committee on February 17,

1892. Rep. Rockwell describes the relationship between the Indian people in the

English colonies and the subsequent American government:

"The people of all the English colonies, especially those of New England, settled their towns upon the basis of title procured by the equitable purchase from the Indians…" "The English Government never attempted to interfere with the internal affairs of the Indian Tribes further than to keep out the agents of foreign powers…" "…They were considered as nations competent to maintain the relations of peace and war and to govern themselves under the Protection of the Government of Great Britain. After the war of the Revolution, or upon the attainment of independence, the United States succeeded to the rights of Great Britain, and continued the policy instituted by that Government. The protections given was understood by all parties as

26

only binding the Indians to the Government of the United States as
dependent allies."

Rep. Rockwell concluded:

"We found that it was a condition and not a theory that confronted us."

The Supreme Court ruled that statehood does not abrogate a treaty. The court holds

the following:

> In sum, Mille Lacs upended both lines of reasoning in *Ward v. Race
> Horse*, 163 U.S. 504, 16 S. Ct. 1076 (1896). The case established that the
> crucial inquiry for treaty termination analysis is whether Congress has
> expressly abrogated an Indian treaty right or whether a termination point
> identified in the treaty itself has been satisfied. Statehood is irrelevant to this
> analysis unless a statehood Act otherwise demonstrates Congress' clear
> intent to abrogate a treaty, or statehood appears as a termination point in the
> treaty. See 526 U. S., at 207, 119 S. Ct. [**858] 1187, 143 L. Ed. 2d 270.
> "[T]here is [*1697] nothing inherent in the nature of reserved treaty rights
> to suggest that they can be extinguished by implication at statehood." Ibid.

*Herrera v. Wyoming*, 139 S. Ct. 1686, 1696-97 (2019)

The same can be said of the Colony of New York transforming into statehood. The

lower court must also consider this historical relationship with Indian Nation in

what is now called New York State and the governments have stayed consistent

from Dutch control until present day control. Plaintiffs presented the lower court

with documentary evidence of this relationship based on New York State's

documents.  The Andros treaty has never been abrogated. Defendants point to

general laws enacted by New York State, but these laws do not specifically

abrogate any treaty rights of the Unkechaug. The laws that Defendants point to run

contrary to the New York State Constitution Section 14 which provides:

> Such parts of the common law, and of the acts of the legislature of the
> colony of New York, as together did form the law of said colony, on the
> nineteenth day of April, one thousand seven hundred and seventy-five,
> and the resolutions of the congress of said colony, and of the convention
> of the State of New York, in force on the twentieth day of April, one
> thousand seven hundred seventy-seven, which have not since expired, or
> been repealed or altered; and such acts of the legislature of this state as
> are now in force, shall be and continue the law of this state, subject to
> such alterations as the legislature shall make concerning the same. But
> all such parts of the common law, and such of the said acts, or parts
> thereof, as are repugnant to this constitution, are hereby abrogated.

These laws also run contrary to the unique relationship between Indian

Nations and the Colony of New York and continued by the State of New York.

Additionally, pursuant to the long-standing blanket acknowledgement of the acts

of the colonial government and acceptance of those acts by the New York State

government. In a letter by, Attorney for the executive branch of New York State,

Robert Batson to Barbara M. Whiplush, Esq., Assistant Town Attorney Town of

Brookhaven on April 15, 1994, he states the following:

> It is my understanding that the State of New York honored deed and
> patents granted by its colonial predecessor. You may want to research the
> first State Constitution and the early session laws of the State Legislature. I
> believe you will find that there was a blanket acknowledgment of the acts
> of the colonial government, and not
> acknowledgement of each individual transaction such as the 1700 deed by
> Col. William Smith.

28

(A5405-A5407)

Consistent with this position is an opinion letter from New York State Attorney

General, Dennis C. Vacco that stated on August 29, 1996, the following:

> The Only tribes recognized by the State and not the Federal
> Government are the Unkechaug and Shinnecock tribes, whose relationship
> and treaties with New York State Government predate the existence of the
> Federal Government.

(A5411-A5412)

Once again Governor Cuomo in 1988 ordered Henrick N. Dullea the Director of

State Operations and policy Management of New York to give a report of the

relationship between the State of New York and nine Indian Nations. This report

also details how New York State followed the treaties entered between the English

Colony and the Native Nations stating the following:

> The Shinnecock and Poospatuck (Unkechauge) Tribes, of
> Algonquin origin, reside on reservations in Suffolk County. These nations
> are recognized by New York State through treaties negotiated with our
> colonial predecessors…

(A5414-A5416)

This unique relationship between New York State and Indian Nations now

residing inside the borders of New York State requires this Court to analyze this

treaty consistent with New York's understanding.   The State or Federal

Government must clearly set out its intent to abrogate any Indian Treaty. "The

United States may abrogate treaties with Indian tribes, just as it may abrogate

treaties with fully sovereign nations. However, it may abrogate a treaty with an

Indian tribe only by an Act of Congress that "clearly express[es an] intent to do

so." *Minnesota v. Mille Lacs Band of Chippewa Indians*, 526 U.S. 172, 202, 119

S. Ct. 1187, 143 L. Ed. 2d 270 (1999).

*United States v. Washington*, 853 F.3d 946, 967 (9th Cir. 2017) The laws cited to

by Defendants are not clear expressions of intent to abrogate the treaty at issue. It

is also counter to the historical relationship between the Unkechaug and New

York State. Based upon the evidence presented above and submitted to the lower

court for summary judgment the Court misapplied the facts and misapprehended

the law. **In conclusion and for the above reasons, the Court should reverse

and remand the lower court's Decision and Order.**

Respectfully Submitted,

/s/ James F. Simermeyer

James F. Simermeyer
President
Law Offices of James F. Simermeyer, P.C.
445 Broad Hollow, Rd Suite 25
Melville, NY 11747
Tel: 347-225-2228
Email: James@Simermeyer.com
Attorney for Plaintiffs-Appellants

## CERTIFICATION PURSUANT TO
## Fed. R. App. P. 32(a)(7)(B) and (C)

The undersigned hereby certifies that the foregoing brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) and (C) because the brief contains 7,702 words of text.

The brief complies with the typeface requirements of Fed. R. App. P.32(a)(5) and the type style requirements of Fed.R.App.P.32(a)(6) because this brief was prepared in a proportionally spaced typeface using Microsoft Word 2003, Times New Roman, Size 14.

Dated: Melville, New York
      October 25, 2023

                          /s/ _____