# 23-1013

## United States Court of Appeals for the Second Circuit

UNKECHAUG INDIAN NATION, HARRY B. WALLACE,

*Plaintiffs-Appellants,*

v.

BASIL SEGGOS, in his official capacity as the Commissioner of the New York State Department Environmental Conservation, NEW YORK STATE DEPARTMENT OF ENVIRONMENTAL CONSERVATION,

*Defendants-Appellees.*

On Appeal from the United States District Court for the Eastern District of New York

## BRIEF FOR APPELLEES

BARBARA D. UNDERWOOD
  *Solicitor General*
JUDITH N. VALE
  *Deputy Solicitor General*
ELIZABETH A. BRODY
  *Assistant Solicitor General*
    *of Counsel*

LETITIA JAMES
  *Attorney General*
  *State of New York*
Attorney for Appellees
28 Liberty Street
New York, New York 10005
(212) 416-6167

Dated: March 25, 2024

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ..................................................................iv

PRELIMINARY STATEMENT ......................................................... 1

ISSUES PRESENTED ...................................................................... 3

STATEMENT OF THE CASE ........................................................... 4

    A.   The American Eel and Its Decline............................................ 4

    B.   The State-Federal Regulatory Framework Protecting
         the American Eel ..................................................................... 6

    C.   Factual Background................................................................. 8

         1.   Plaintiffs' glass eel poaching and DEC's attempts at
             cooperation and consultation............................................. 8

         2.   Plaintiffs' state-court lawsuit ......................................... 12

    D.   This Lawsuit ........................................................................ 13

         1.   The complaint ................................................................. 13

         2.   Discovery and summary judgment motions..................... 15

         3.   The district court's decision granting summary
             judgment ........................................................................ 16

SUMMARY OF ARGUMENT ....................................................... 19

ARGUMENT ................................................................................. 22

i

**Page**

POINT I

THE DISTRICT COURT CORRECTLY GRANTED SUMMARY JUDGMENT TO DEFENDANTS BASED ON LEGAL DETERMINATIONS THAT DID NOT INVOLVE ANY DISPUTED ISSUES OF FACT OR EXPERT TESTIMONY .........22

    A.    The District Court Correctly Determined That the Andros Order Does Not Preempt New York Law. .................24

        1.    The Andros Order is not federal law. ..............................24

        2.    The Andros Order unambiguously subjects Unkechaug fishing rights to colonial law and, by implication, its successors. .........................................29

        3.    Plaintiffs' purported expert evidence was irrelevant to the court's legal rulings and did not raise any material dispute of fact .....................................................34

    B.    25 U.S.C. § 232 Is Irrelevant Here. .......................................38

POINT II

IN THE ALTERNATIVE, THE DISTRICT COURT CORRECTLY DETERMINED THAT NEW YORK'S FISHING REGULATIONS ARE VALID UNDER THE CONSERVATION NECESSITY DOCTRINE...................................................40

POINT III

PLAINTIFFS' REMAINING ARGUMENTS LACK MERIT ............................45

POINT IV

THIS COURT MAY ALTERNATIVELY AFFIRM THE JUDGMENT ON OTHER GROUNDS APPEARING IN THE RECORD ......................................50

    A.    Res Judicata Bars Plaintiffs' Claims Here.............................51

**Page**

B. The Eleventh Amendment Bars This Lawsuit........................54

    1. The *Coeur d'Alene* doctrine bars plaintiffs' claims. ........54

    2. The *Pennhurst* doctrine bars plaintiffs' claims regarding the Andros Order. ...........................................57

C. The *Sherrill* Doctrine Bars Plaintiffs' Claims........................58

CONCLUSION .................................................................60

# TABLE OF AUTHORITIES

**Cases** **Page(s)**

*Alliance to Save the Mattaponi v. Commonwealth,*
270 Va. 423 (2005) ............................................................... 25

*Anderson v. Evans,*
371 F.3d 475 (9th Cir. 2004)...................................... 31, 41

*Antoine v. Washington,*
420 U.S. 194 (1975).............................................................. 32

*Association for Reduction of Violence v. Hall,*
734 F.2d 63 (1st Cir. 1984) ................................................ 47

*Avero Belgium Ins. v. American Airlines, Inc.,*
423 F.3d 73 (2d Cir. 2005) ................................................ 26

*Blatchford v. Native Vill. of Noatak,*
501 U.S. 775 (1991)............................................................. 54

*Borthwick v. First Georgetown Sec., Inc.,*
892 F.2d 178 (2d Cir. 1989) ............................................. 47

*Cayuga Indian Nation of N.Y. v. Village of Union Springs,*
390 F. Supp. 2d 203 (N.D.N.Y. 2005) ................................ 59

*Chaney v. Wadsworth,*
No. 9:14-cv-177, 2015 WL 4031441 (D. Mont. July 1, 2015).............. 25

*Choctaw Nation of Indians v. United States,*
318 U.S. 423 (1943)............................................................. 33

*City of Sherrill v. Oneida Indian Nation of N.Y.,*
544 US. 197 (2005)................................................ 22, 51, 58

*Cloverleaf Realty of N.Y., Inc. v. Town of Wawayanda,*
572 F.3d 93 (2d Cir. 2009) ................................................ 51

**Cases**                                                        **Page(s)**

*Contemporary Mission, Inc. v. U.S. Postal Serv.,*
  648 F.2d 97 (2d Cir. 1981) ................................................. 47

*Dalberth v. Xerox Corp.,*
  766 F.3d 172 (2d Cir. 2014) .......................................... 34-35

*Denezpi v. United States,*
  596 U.S. 591 (2022) ........................................................ 26

*Department of Game of Wash. v. Puyallup Tribe,*
  414 U.S. 44 (1973) .......................................................... 41

*Fairfax's Devisee v. Hunter's Lessee,*
  11 U.S. 603 (1812) .......................................................... 28

*Fond du Lac Band of Chippewa Indians v. Carlson,*
  68 F.3d 253 (8th Cir. 1995) .......................................... 57-58

*Georges v. United Nations,*
  834 F.3d 88 (2d Cir. 2016) ............................................. 29

*Golden Hill Paugussett Tribe of Indians v. Weicker,*
  839 F. Supp. 130 (D. Conn. 1993) .................................. 25

*Herrera v. Wyoming,*
  139 S. Ct. 1686 (2019) .................................................... 40

*Idaho v. Coeur d'Alene Tribe of Idaho,*
  521 U.S. 261 (1997) .................................................. 54, 56

*In re Omnicom Grp., Inc. Sec. Litig.,*
  597 F.3d 501 (2d Cir. 2010) ............................................ 35

*Kulak v. City of New York,*
  88 F.3d 63 (2d Cir. 1996) ............................................... 44

*Libertarian Party of Conn. v. Lamont,*
  977 F.3d 173 (2d Cir. 2020) ............................................ 57

**Cases**                                                                   **Page(s)**

*Lunaas v. United States*,
   936 F.2d 1277 (Fed. Cir. 1991) .......................................................... 27

*Matter of Hunter*,
   4 N.Y.3d 260 (2005) ...................................................................51-52

*Matter of People v. Applied Card Sys., Inc.*,
   11 N.Y.3d 105 (2008) ......................................................................... 51

*McClanahan v. State Tax Comm'n of Ariz.*,
   411 U.S. 164 (1973) ............................................................................. 23

*Mescalero Apache Tribe v. Jones*,
   411 U.S. 145 (1973) ............................................................................. 23

*Migra v. Warren City Sch. Dist. Bd. of Educ.*,
   465 U.S. 75 (1984) ............................................................................... 51

*Miller Marine Servs., Inc. v. Travelers Prop. Cas. Ins. Co.*,
   197 F. App'x 62 (2d Cir. 2006) .......................................................... 35

*Minnesota v. Mille Lacs Band of Chippewa Indians*,
   526 U.S. 172 (1999) ............................................................................. 40

*New York v. Atlantic States Marine Fisheries Comm'n*,
   609 F.3d 524 (2d Cir. 2010) ............................................................... 46

*O'Brien v. City of Syracuse*,
   54 N.Y.2d 353 (1981) .......................................................................... 52

*Oklahoma v. Castro-Huerta*,
   597 U.S. 629 (2022)............................................................................. 39

*Oneida Indian Nation of N.Y. v. New York*,
   691 F.2d 1070 (2d Cir. 1982) .........................................................30-31

*Oneida Indian Nation of N.Y. v. New York*,
   860 F.2d 1145 (2d Cir. 1988) .........................................................28-29

## Cases                                                                 Page(s)

*Oregon Dep't of Fish & Wildlife v. Klamath Indian Tribe*,
 473 U.S. 753 (1985)...............................................29-33, 40

*Pennhurst State School & Hospital v. Halderman*,
 465 U.S. 89 (1984)................................................57

*People ex rel. Kennedy v. Becker*,
 241 U.S. 556 (1916)...............................................31

*Puyallup Tribe v. Department of Game of Wash.*,
 391 U.S. 392 (1968)...............................................41

*Salahuddin v. Coughlin*,
 993 F.2d 306 (2d Cir. 1993) ....................................38, 49

*Santee Sioux Tribe of Neb. v. Nebraska*,
 121 F.3d 427 (8th Cir. 1997)......................................57

*Sarkissian Mason, Inc. v. Enterprise Holdings, Inc.*,
 572 F. App'x 19 (2d Cir. 2014) ...................................35

*Seneca-Cayuga Tribe of Okla. v. Town of Aurelius*,
 233 F.R.D. 278 (N.D.N.Y. 2006) ..................................59

*Silva v. Farrish*,
 47 F.4th 78 (2d Cir. 2022)........................................56

*Skoros v. City of New York*,
 437 F.3d 1 (2d Cir. 2006) ........................................49

*South Carolina v. Catawba Indian Tribe, Inc.*,
 476 U.S. 498 (1986)........................................26, 30, 32, 36

*Strange v. Montefiore Hosp. & Med. Ctr.*,
 59 N.Y.2d 737 (1983) ............................................53

*Sudler v. City of New York*,
 689 F.3d 159 (2d Cir. 2012) ......................................50

**Cases**                                                                    **Page(s)**

*Terry v. Incorporated Vill. of Patchogue,*
  826 F.3d 631 (2d Cir. 2016) .............................................................. 53

*Three Affiliated Tribes of Fort Berthold Rsrv. v. Wold Eng'g, P.C.,*
  467 U.S. 138 (1984) ........................................................................ 39

*Trustees of Dartmouth College v. Woodward,*
  17 U.S. 518 (1819) .......................................................................... 28

*Tulee v. Washington,*
  315 U.S. 681 (1942) ........................................................................ 40

*United States v. Choctaw Nation,*
  179 U.S. 494 (1900) ........................................................................ 30

*United States v. Cook,*
  922 F.2d 1026 (2d Cir. 1991) .......................................................... 38

*United States v. Washington,*
  384 F. Supp. 312 (W.D. Wash. 1974) .......................................... 33-34

*Washington State Dep't of Licensing v. Cougar Den, Inc.,*
  139 S. Ct. 1000 (2019) .................................................................... 37

*Watts v. Swiss Bank Corp.,*
  27 N.Y.2d 270 (1970) ...................................................................... 52

*Western Mohegan Tribe & Nation v. Orange Cnty.,*
  395 F.3d 18 (2d Cir. 2004) ......................................................... 54, 56

*Wilson v. Glenro, Inc.,*
  524 F. App'x 739 (2d Cir. 2013) ..................................................... 36

**Constitution**                                                       **Page(s)**

U.S. Const. art. VI, cl. 1 ................................................................ 27

**Laws & Regulations**

*Federal*

16 U.S.C.
    § 5101 et seq. .......................................................................... 6
    § 5102 ........................................................................................ 6
    § 5104 ........................................................................................ 6
    § 5106 ........................................................................................ 6

25 U.S.C. § 232 ................................................................... 18, 38-39

*New York*

Environmental Conservation Law
    § 11-0707 ............................................................................ 9, 22
    § 25-0401 .............................................................................. 50
    § 71-0924 .............................................................................. 10

Indian Law § 2 ................................................................................ 8

Penal Law § 10.01 ......................................................................... 10

6 N.Y.C.R.R.
    § 10.1 ....................................................................................... 8
    § 40.1 .................................................................................. 8, 23

**Miscellaneous Authorities**

Bureau of Indian Affairs, Search Federally Recognized Tribes (n.d.),
    https://www.bia.gov/service/tribal-leaders-directory/federally-
    recognized-tribes ........................................................... 8-9

*Cohen's Handbook of Federal Indian Law*
    (Nell Jessup Newton ed., 2012) ............................ 8-9, 38-39

| **Miscellaneous Authorities** | **Page(s)** |
|---|---|

H.R. Rep. No. 80-2355 (1948) .................................................................. 39

*Restatement of the Law-The Law of American Indians*
   (Westlaw Mar. 2024 update) ......................................................... 25, 57

x

# PRELIMINARY STATEMENT

After members of the Unkechaug Indian Nation were ticketed for illegally poaching baby eels in New York state waters, the Nation and its Chief Harry B. Wallace filed this lawsuit. Plaintiffs seek a declaration that the Nation's members are immune from New York's environmental laws concerning fishing, and an injunction barring the New York State Department of Environmental Conservation (DEC) and its commissioner from enforcing such environmental laws against members, employees, or agents of the Unkechaug Nation. (A. 26.) Plaintiffs further seek to have New York discard its federally mandated eel management plan and adopt a substitute plan that would grant the Unkechaug Nation the exclusive right to manage eel in New York State. Both parties cross-moved for summary judgment, and the U.S. District Court for the Eastern District of New York (Kuntz, J.) granted summary judgment to DEC.

This Court should affirm. Contrary to plaintiffs' arguments, New York's fishing regulations are not preempted by any federal treaty or statute. Plaintiffs rely on an order issued in 1676 by New York's colonial governor Sir Edmund Andros (the "Andros Order"). But as the district court correctly concluded, the Andros Order is not federal law for purposes

of the Supremacy Clause because it predates the formation of the United States by more than a century and has not been ratified by Congress. The court also properly concluded that even if applicable here, the Andros Order would not immunize the Unkechaug Nation from New York's fishing regulations because it unambiguously grants the Unkechaug fishing rights subject to the "law and Custom of the Government"—which plainly includes the State's generally applicable fishing regulations. Plaintiffs' purported expert evidence was irrelevant to the district court's legal conclusions on these points and, in any event, was consistent with these conclusions.

Moreover, the district court further correctly held that even if the Andros Order were a valid federal treaty that granted broad fishing rights to the Unkechaug and preempted New York's general regulation of fishing, New York's specific prohibition on harvesting baby eels would not be preempted, under the conservation necessity doctrine. That is because New York's prohibition on harvesting baby eels extends to everyone—including non-Native Americans—who fish in state waters, and it is undisputed that New York promulgated this prohibition to help stop the depletion of the American eel.

Finally, this Court may affirm the district court's grant of summary judgment on any of several alternative grounds that appear in the record. For example, res judicata bars this lawsuit because plaintiffs brought and lost a state-court lawsuit based on the same nucleus of operative facts in 2016. In addition, the Eleventh Amendment bars this lawsuit because plaintiffs seek to divest New York of its regulatory authority over state waters and because the Andros Order is, at most, state law that cannot support an injunction from a federal court.

## ISSUES PRESENTED

1. Whether the district court correctly concluded that the application of New York's fishing regulations to the Unkechaug Nation is not preempted by federal law.

2. Whether the district court correctly held, in the alternative, that even if the application of New York's fishing regulations to the Unkechaug Nation were generally preempted, New York's specific prohibition on harvesting baby eels would still be valid as applied to them under the conservation necessity doctrine.

3. Whether plaintiffs' assorted claims of procedural error are meritless.

3

4. Whether the district court's grant of summary judgment should be affirmed on alternative grounds appearing in the record, including res judicata, the State's Eleventh Amendment sovereign immunity, or untimeliness of this lawsuit.

## STATEMENT OF THE CASE

### A.    The American Eel and Its Decline

American eel play a vital role in the marine ecosystem of East Coast States, and support valuable commercial, recreational, and subsistence fisheries. All American eel spawn and hatch in the Sargasso Sea, an area in the Atlantic Ocean near Bermuda. Within a year of hatching, American eel metamorphose into "glass eels," which are about two to three inches long and have transparent skin. Glass eels migrate en masse from ocean waters to coastal tributaries and, eventually, to fresh waters. After spending several years in fresh water, glass eels metamorphose into "yellow eels," which are larger, sexually immature adult eels. After between three and twenty years, yellow eels reach maturity and return to the Sargasso Sea to spawn. (A. 2329.)

Historically, American eel were abundant in streams along the East Coast, comprising more than a quarter of fish biomass. However, in the

4

1990s, fisheries scientists observed a decline in the American eel population. The scientists determined that this decline was attributable to many factors, including commercial fishing. (A. 2329-2330.)

Since approximately 2011, the American eel's decline has been exacerbated by the emergence of a lucrative overseas trade for glass eels. (*See* A. 1704.) Because eels cannot be bred in captivity, eel farming operations—the majority of which are overseas—must purchase wild-caught glass eels to stock their farms. (*See* A. 1371, 1375, 1449.) As the populations of Japanese eel and European eel have declined, and as Europe has restricted exports, demand for American glass eels has skyrocketed. In recent years, American glass eels have fetched more than $2,000 per pound. (*See* A. 1472-1473, 1503, 1515, 1704, 2332.)

In addition to having a high market price, glass eels are relatively easy to catch. Because glass eels migrate en masse from salt water to fresh water with tidal currents, fishers can catch thousands of glass eels simply by dipping mesh nets into coastal tributaries as the tide comes in. (*See* A. 1370-1371, 2431, 4586-4587; *see also* A. 1362.)

The Atlantic States Marine Fisheries Commission has observed that "the high market prices are an encouragement to poaching in many

states." (A. 2501.) For example, from 2011 to 2014, the U.S. Fish and Wildlife Service conducted an undercover investigation into wide-scale glass eel poaching along the Eastern seaboard, which resulted in prosecutions for over $7 million dollars in illegal sales. (A. 2319.)

## B. The State-Federal Regulatory Framework Protecting the American Eel

New York is a member of the Atlantic States Marine Fisheries Commission (ASMFC), which is established under federal law. *See* 16 U.S.C. § 5101 et seq. The fifteen States that make up the ASMFC act under congressional authority to manage aquatic species within their jurisdictions through species-specific fishery management plans. *Id.* § 5104(a); *see id.* § 5102(1)-(2). Under federal law, all member States covered by a fishery management plan for a species must implement the required plan provisions into state law. *Id.* § 5104(b). If the Commission determines that a member State is not in compliance with a fishery management plan, the U.S. Secretary of Commerce is authorized to declare a moratorium on fishing for that species. *Id.* § 5106(c). (*See* A. 2327-2328.)

In the 1990s, scientists working with the ASMFC recognized a decline in the American eel population. (A. 2329.) In 1999, the Commission

adopted a fishery management plan for the American eel. (A. 1256, 2330; *see* A. 1350-1442.) The plan required thirteen States, including New York, to prohibit the possession of any eel less than six inches in length and to limit each recreational fisher to a total daily catch of fifty eels per day.[1] (A. 1414, 2330; *see* A. 1257.) These prohibitions necessarily banned the harvest of glass eels, which are less than six inches in length. (*See* A. 1370.)

In 2012, a peer-reviewed scientific assessment by the ASMFC found that the American eel species was "depleted" and at or near historically low levels. (A. 1251, 1255, 2332.) After reviewing the assessment, the Commission elected to modify certain aspects of the existing fishery management plan. (*See* A. 1445, 1468, 2332.) As relevant here, in each of the thirteen States, the modified plan prohibited the possession of any eel less than nine inches in length and limited each recreational fisher to a total daily catch of twenty-five eels per day. The plan also subjected commercial fishers to a coastwide numerical quota for yellow eel. (A. 1456-1457, 1468, 2332; *see* A. 1257.) As required by federal law, DEC

---

[1] The plan grandfathered in preexisting glass eel fisheries in two States, South Carolina and Maine. (A. 2330.) South Carolina's glass eel fishery is extremely small, and Maine's glass eel fishery is currently subject to a quota. (*See* A. 2342.)

adopted the modified fishery management plan provisions into state law. *See* 6 N.Y.C.R.R. §§ 10.1(a)-(b), 40.1(b)(1)(ii)-(iii), (f).

In 2017, an updated, peer-reviewed scientific assessment by the ASMFC showed that the population of American eel continued to be depleted. (*See* A. 1727.)

## C.   Factual Background

### 1.   Plaintiffs' glass eel poaching and DEC's attempts at cooperation and consultation

In early 2014, after the State of Maine responded to record harvests of glass eels by instituting a statewide quota, members of the Maine-based Passamaquoddy Tribe began meeting with other tribes along the East Coast to encourage those tribes to establish glass eel fisheries. (*See* A. 1779-1780; *see also* A. 2342, 2706.) Among the tribes approached were the Unkechaug Indian Nation in Long Island, New York. The Unkechaug Indian Nation is a sovereign tribe that is recognized by the State of New York pursuant to state law but has not been recognized by the United States Department of the Interior.[2] *See* N.Y. Indian Law § 2; <u>Bureau of</u>

---

[2] For an explanation of the difference between federally recognized and non-federally recognized tribes, see *Cohen's Handbook of Federal*
(continued on the next page)

Indian Affairs, Search Federally Recognized Tribes (n.d.).[3] It is undisputed that, prior to 2010, the Unkechaug Nation had never fished for glass eels, and there is no evidence in the record that the Unkechaug had ever engaged in glass eel fishing prior to meeting with members of the Passamaquoddy Tribe in 2014. (*See* A. 1779-1780; *see also* A. 2964.)

In March 2014, DEC officers encountered eight individuals—two members of the Unkechaug Nation, three members of the Passamaquoddy Tribe, and three other individuals—harvesting glass eels in New York state waters that are not on reservation lands. (A. 1059-1074; *see* A. 1765-1766, 2966, 2978-2979, 4542.) The individuals carried a purported permit on the letterhead of the Unkechaug Tribal Council, signed by Chief Wallace, stating that four of the individuals were "authorized to engage in traditional glass eel fishing pursuant to the Tribal Customs and practices of the Unkechaug Indian Nation." (A. 3002; *see* A. 1065.) Two of the

---

*Indian Law* § 3.02[3], at 133-135 (Nell Jessup Newton ed., 2012). New York does not dispute the Unkechaug Nation's sovereignty over its reservation lands in Long Island and is not seeking to regulate fishing that takes place on the Unkechaug reservation. See N.Y. Env't Conserv. Law § 11-0707(8). (*See* A. 924, 2778.)

[3] (For authorities available online, full URLs appear in the Table of Authorities. All URLs were last visited on March 25, 2024.)

individuals listed on the permit were not members of the Unkechaug Nation. (A. 2966, 4542.)

During this encounter, one of the individuals telephoned Chief Wallace, who arrived on the scene. A DEC officer explained to Chief Wallace that fishing for glass eels in waters outside of the reservation was prohibited. (*See* A. 1071.) DEC seized roughly seven and a half pounds of glass eels and ticketed the individuals. (A. 2817-2818; *see, e.g.,* A. 3262-3264.) Six of the individuals resolved the charges by pleading guilty to violations, which are offenses but not crimes under New York law. (A. 2780.) *See* N.Y. Penal Law § 10.01(3).

In May 2014, the U.S. Fish and Wildlife Service notified DEC of a planned shipment of glass eels from John F. Kennedy International Airport to Hong Kong. (A. 4377.) DEC intercepted the shipper, who stated that he had received the eels from the Unkechaug Nation. (A. 4378.) DEC referred the case to the Queens County District Attorney's Office for potential prosecution under New York Environmental Conservation Law (ECL) § 71-0924.[4] (A. 4380.) In May 2015, the Unkechaug Nation exported

_____

[4] ECL § 71-0924 criminalizes the illegal commercialization of fish, shellfish, crustaceans, and wildlife. ECL § 71-0924.

approximately 23 kilograms (approximately 50 pounds) of glass eels to Hong Kong in two shipments, with a total declared value of approximately $69,360. (*See* A. 2996-2998.)

In March 2016, a deputy DEC commissioner reached out to the plaintiffs by letter, seeking to "open a dialogue between the people of the Unkechaug Indian Nation and [DEC] concerning conservation and management of the American Eel species." The letter invited the Unkechaug Nation "to join New York State in protecting the American eel species," and asked the Nation to provide DEC with any relevant information regarding its claimed right to take glass eels, including any "treaty-based rights authorizing the harvest." (A. 4195.) The Unkechaug responded that the tribe's fishing rights "can never be restricted nor otherwise regulated by the State of New York" and that the tribe did not need permission to engage in glass eel fishing. The letter did not mention any federal statute or treaty. (*See* A. 4176-4177.)

In April 2016, DEC enforcement officers intercepted a shipment of approximately sixteen kilograms (approximately thirty-four pounds) of glass eels at John. F. Kennedy International Airport, bound for Hong

Kong, with a declared market value of $37,200.[5] The shipper was listed as "Unkechaug Indian Nation/ Harry Wallace, Chief." (A. 2780, 2822, 2837, 3000.)

### 2. Plaintiffs' state-court lawsuit

Two days after the April 2016 shipment was intercepted, the Unkechaug Indian Nation filed a lawsuit against DEC in Supreme Court, Queens County, seeking money damages for the glass eels and a "permanent injunction against the . . . NYSDEC for violation of the constitutional and sovereign rights of the Unkechaug Indian nation." (A. 2824-2829.) The complaint alleged that DEC had violated the Nation's sovereign fishing rights and interfered with its religious practice. (A. 2828.) The complaint did not mention any federal treaty or statute.

DEC moved to dismiss the complaint, arguing, inter alia, that the Nation failed to state a claim for which relief could be granted because the Nation does not have any legal right to take or possess glass eels in contravention of state law. (A. 2862-2874; *see* A. 2781.) The Nation did

---

[5] DEC referred the case to the Office of the New York State Attorney General, which initiated an investigation. (*See* A. 998-999.)

not file opposition papers. Instead, after the deadline to oppose had passed, the Nation moved for an order to show cause why the case should not be dismissed without prejudice. (A. 2877-2885; *see* A. 2781.) In October 2016, the state trial court issued an order granting "the branch of [DEC]'s motion to dismiss the plaintiff's complaint upon the grounds that the complaint fails to state a cause of action." (A. 2907.) The Nation withdrew its order to show cause and did not appeal. (*See* A. 2781, 2905.)

## D.   This Lawsuit

### 1.   The complaint

In February 2018, approximately one and a half years after the state-court lawsuit was dismissed, plaintiffs filed this federal lawsuit against DEC and its commissioner in his official capacity. Plaintiffs alleged that DEC's prohibition on glass eel fishing was preempted by the Andros Order, which plaintiffs claimed was a federal treaty with the Unkechaug Nation.[6] Plaintiffs also claimed that DEC's regulations were

---

[6] The Andros Order is not available in any federal or New York code and is instead available in two historical compilations of New York colonial papers. (*See* A. 1963-1964, 2019, 2022-2023.) According to one of those compilations, the Andros Order reads:

*(continued on the next page)*

preempted by 25 U.S.C. § 232, a federal statute that extends New York's criminal enforcement jurisdiction into reservation lands. And plaintiffs further claimed, inter alia, that unspecified state prohibitions on dumping construction debris and other fill in tidal wetlands violated the Nation's First Amendment right to religious expression. (A. 15, 22-25.)

Plaintiffs sought declaratory and injunctive relief to preclude DEC from enforcing any state fishing laws against the Unkechaug, its employees, or its agents. Plaintiffs also sought to enjoin defendants from civilly or criminally prosecuting plaintiffs in relation to the April 2016 seizure of glass eels. (A. 26.)

---

Upon the request of the Ind[ ]s of Unchechauge upon Long Island

Resolved and ordered that they are at liberty and may freely whale or fish for or with Christians or by themselves and dispose of their effects as they thinke good according to law and Custome of the Government of which all Magistrates officers or others whom these may concerne are to take notice and suffer the said Indyans so to doe without any manner of lett hindrance or molestacion they comporting themselves civilly and as they ought.

(A. 3007.)

14

DEC moved to dismiss the complaint, and the district court (Kuntz, J.) denied the motion. (*See* A. 929, 944.)

## 2. Discovery and summary judgment motions

In April 2019, plaintiffs filed a letter motion seeking to compel production of all materials listed on DEC's privilege log or, in the alternative, for an in-camera review of all such materials. (A. 36-38.) At a hearing that same month, the district court ordered DEC to submit a copy of its privilege log and all privileged materials to chambers. (A. 929-930; *see also* A. 931-932.) DEC provided the district court with its privilege log and with copies of all privileged materials (A. 6), and the district court did not thereafter order DEC to produce any privileged materials to plaintiffs.

During discovery, plaintiffs retained two experts: Mr. Frederick Moose Moore and Dr. John Strong. Mr. Moore, a member of the Passamaquoddy Tribe who had contacted plaintiffs in early 2014 about glass eel fishing, and who was ticketed for poaching glass eels with members of the Unkechaug Nation in March 2014, was retained to provide testimony on "American Eel fishing by Native Americans." (A. 1042; *see* A. 1072, 1779-1780.) Dr. Strong, a historian, was retained to provide testimony on the Andros Order. (A. 2148-2149, 2157.) Defendants retained

15

one expert, Ms. Toni Kerns, a director at the ASMFC, to testify about the life cycle of the American eel, threats to the species, and the need for New York's prohibition on glass eel harvesting. (A. 1264-1265.)

In June 2021, the parties submitted cross-motions to exclude each other's experts. (*See* A. 1003-1004, 1172-1174.) In August 2021, the parties cross-moved for summary judgment. (*See* A. 2239-2240, 3057-3059.)

### 3. The district court's decision granting summary judgment

In June 2023, the district court granted defendants' motion for summary judgment and denied plaintiffs' motion for summary judgment. (SPA 1.) The district court declined to dismiss the case on threshold grounds, such as sovereign immunity and res judicata. (SPA 7-20.) Instead, the court granted DEC's motion for summary judgment on the merits. (SPA 20-39.)

First, as relevant here, the district court found that the Andros Order did not preempt New York's fishing regulations. (SPA 26-32.) As an initial matter, the district court held that the Andros Order was not federal law under the Supremacy Clause because it predated the founding of the United States by a century and because nothing in the record

16

showed that the United States had subsequently ratified the Andros Order. (SPA 26-27.) The district court further concluded that, in any event, even if the Andros Order were a federal treaty, it plainly did not grant the Unkechaug unlimited fishing rights exempt from any state regulation. As the court explained, the Andros Order explicitly subjected the Unkechaug's fishing rights to the "'law and Custome of the Government.'" (SPA 29-32.)

Second, the district court held that, even assuming the Andros Order were a federal treaty that granted the Unkechaug unlimited fishing rights, New York would still be able to validly enforce its prohibition on glass eel harvesting under the U.S. Supreme Court's conservation necessity doctrine. Under this doctrine, the court explained, a State is allowed to restrict a tribe's treaty-based hunting and fishing rights for the purpose of species conservation. (SPA 32-33.)

Third, the district court rejected plaintiffs' argument that 25 U.S.C. § 232 preempted New York's fishing laws. The court explained that this statute expands New York's criminal jurisdiction over tribal reservations

and does not limit New York's authority over its own state lands and waters.[7] (*See* SPA 22.)

Lastly, the district court determined that neither New York's prohibition on glass eel fishing nor its wetlands regulations violated plaintiffs' First Amendment rights. The court concluded that both sets of regulations were neutral laws of general applicability that burdened plaintiffs' religion only incidentally, if at all. (SPA 36-39.) The court explained that the uncontroverted summary judgment record demonstrated that New York had adopted both sets of regulations for valid environmental purposes—not religious animus toward Native Americans. (SPA 37-39.)

---

[7] 25 U.S.C. § 232 reads in full:

> The State of New York shall have jurisdiction over offenses committed by or against Indians on Indian reservations within the State of New York to the same extent as the courts of the State have jurisdiction over offenses committed elsewhere within the State as defined by the laws of the State: *Provided*, That nothing contained in this section shall be construed to deprive any Indian tribe, band, or community, or members thereof, hunting and fishing rights as guaranteed them by agreement, treaty, or custom, nor require them to obtain State fish and game licenses for the exercise of such rights.

## SUMMARY OF ARGUMENT

I. The district court correctly granted summary judgment to defendants. The district court correctly rejected plaintiffs' preemption claims because federal law does not grant the Unkechaug Nation an unlimited right to fish in state waters.

First, the Andros Order is not federal law under the Supremacy Clause because it predates the founding of the United States by one hundred years and because the United States has not subsequently ratified the Andros Order. In any event, even if the Andros Order were federal law, it plainly would not grant the Unkechaug unlimited fishing rights or broad-based immunity from generally applicable state fishing regulations. Indeed, the Andros Order unambiguously provides that Unkechaug fishing rights are subject to the "law and Custom of the Government."

Plaintiffs failed to raise any genuine dispute of material fact regarding the lack of federal preemption. Contrary to plaintiffs' arguments, the testimony of Dr. Strong was irrelevant to the district court's legal conclusions. And in any event, Dr. Strong agreed that the Unkechaug would have understood the phrase "law and Custom of the Government"

19

to grant commercial fishing rights subject to English laws enforceable in colonial courts, like any English or Dutch colonist.

Second, plaintiffs have abandoned their argument that 25 U.S.C. § 232 preempts New York's authority by mentioning the statute only in a single, one-sentence footnote. Accordingly, the Court should not address this argument. But if the Court considers it, 25 U.S.C. § 232 is irrelevant. That statute extends New York's criminal jurisdiction over reservation lands and does not concern New York's preexisting plenary jurisdiction over its own state lands or waters.

II. In the alternative, the district court correctly concluded that, even if the Andros Order constitutes a valid federal treaty that grants the Unkechaug unqualified fishing rights, New York would still be able to validly enforce its prohibition on glass eel fishing pursuant to the conservation necessity doctrine. Under that doctrine, valid, treaty-based hunting and fishing rights must yield to a State's nondiscriminatory laws that are reasonable and necessary for species conservation. Here, New York's prohibition on glass eel fishing is nondiscriminatory because it applies to everyone who fishes in state waters. And the prohibition on

harvesting glass eels is reasonable and necessary to stop the decline of the American eel population.

III. Plaintiffs' remaining claims of procedural error are each meritless. For example, plaintiffs misconstrue the district court's decision in arguing that the court improperly relied on the testimony of Ms. Kerns without first ruling on plaintiffs' *Daubert* motion to exclude her testimony. The district court did not rely on Ms. Kerns's testimony. Instead, the court relied on uncontested ASMFC documents that were appended to her declaration and that plaintiffs also relied upon in their own summary judgment motion. Plaintiffs' unsupported speculation about the contents of unspecified privileged documents also does not defeat summary judgment.

IV. Finally, this Court may also affirm the district court's summary judgment decision on alternative grounds appearing in the record. Specifically, the res judicata effect of a state court judgment that dismissed plaintiffs' claims asserting a sovereign right to harvest glass eels in state waters bars plaintiffs' successive lawsuit raising the same claims here. In addition, the Eleventh Amendment does not allow a federal court to order injunctive relief that divests a State of its regulatory authority over

21

state lands or waters, as a judgment for plaintiffs would effectively do here. Nor does the Eleventh Amendment allow a federal court to enjoin a state official based on a purported violation of state law. Lastly, plaintiffs' claim that they are entitled to unlimited fishing rights based on the centuries-old Andros Order is time-barred under *City of Sherrill v. Oneida Indian Nation of N.Y.*, 544 US. 197 (2005).

## ARGUMENT

### POINT I

#### THE DISTRICT COURT CORRECTLY GRANTED SUMMARY JUDGMENT TO DEFENDANTS BASED ON LEGAL DETERMINATIONS THAT DID NOT INVOLVE ANY DISPUTED ISSUES OF FACT OR EXPERT TESTIMONY

At the outset, it is important to note that this case is not about fishing activity that takes place on the Unkechaug reservation. DEC does not dispute that, under New York law, fishing within the Unkechaug reservation is subject to regulation only by the Unkechaug Nation. *See* N.Y. Env't Conserv. Law § 11-0707(8). (*See* A. 924, 2778-2779.) Nor is this case about fishing for adult eels (yellow eels). DEC does not dispute that Unkechaug Nation members, like other residents of New York, may fish recreationally for yellow eels in state waters, and may harvest up to

22

twenty-five yellow eels per person per day. *See* 6 N.Y.C.R.R. § 40.1(f). Instead, this case raises solely the question of whether the Unkechaug are subject to New York's generally applicable prohibition on harvesting glass eels in New York's own state waters.

The parties also agree on the relevant legal tests governing off-reservation fishing. Plaintiffs do not dispute that "states have sovereign power to regulate hunting and fishing within their borders." (A. 3099 (plaintiffs' memorandum of law in support of their summary judgment motion).) Plaintiffs also do not dispute that "[a]bsent a treaty fishing right, the State enjoys the full run of its police powers in regulating off-reservation fishing." (A. 3100 (same).) *See Mescalero Apache Tribe v. Jones*, 411 U.S. 145, 148-49 (1973) (preemption of state law on non-reservation lands requires "express federal law to the contrary"); *McClanahan v. State Tax Comm'n of Ariz.*, 411 U.S. 164, 172 (1973) (same). Against that backdrop, the district court correctly held that plaintiffs had identified no federal treaty or statutory right that preempts New York's glass-eel prohibition. (*See* SPA 25.)

23

**A.    The District Court Correctly Determined That the Andros Order Does Not Preempt New York Law.**

The district court correctly concluded that the Andros Order—plaintiffs' sole basis for their claim of federal treaty-based fishing rights (*see* A. 25)—does not preempt New York's prohibition on glass eel fishing. The Andros Order is not a federal treaty and thus does not preempt state law. In any event, the Order plainly does not give the Unkechaug any right to fish in state waters exempt from generally applicable laws. Instead, the Order expressly provides that Unkechaug fishing rights are subject to the "law and Custome of the Government." As explained below, the Government at that time consisted of the English Crown and the colonial government; that government has been succeeded, for all purposes, by the United States and the several States.

**1.    The Andros Order is not federal law.**

The district court correctly concluded that the Andros Order is not federal in nature. Although tribal treaties with American colonies "may be recognized as a matter of state law," they "are not treaties entitled to

status under the Supremacy Clause."[8] *Restatement of the Law–The Law of American Indians* § 5 cmt. h (Westlaw Mar. 2024 update). Here, it is undisputed that the Andros Order was entered by the colonial governor of New York, and not by any representative of the United States, which would not be founded for another century. Accordingly, the Andros Order is not federal law under the Supremacy Clause. *See Alliance to Save the Mattaponi v. Commonwealth*, 270 Va. 423, 451-52 (2005) (holding that 1677 treaty between colonial government and tribe was not federal law under the Supremacy Clause), *cert. denied*, 547 U.S. 1192 (2006); *Golden Hill Paugussett Tribe of Indians v. Weicker*, 839 F. Supp. 130, 138 (D. Conn. 1993) (federal-question jurisdiction could not be grounded in royal proclamation from 1763); *Chaney v. Wadsworth*, No. 9:14-cv-177, 2015 WL 4031441, at *10 (D. Mont. July 1, 2015) (agreement among tribes, State, and local government did not qualify as federal law).

---

[8] To be clear, DEC does not concede that the Andros Order is a valid treaty in force under New York state law. These questions are not properly before this Court. See *infra* at 57-58 (discussing New York's sovereign immunity from federal-court injunctions grounded in purported violations of state law).

The district court also properly rejected plaintiffs' argument that the United States has since ratified the Andros Order. *See Avero Belgium Ins. v. American Airlines, Inc.*, 423 F.3d 73, 79-80 (2d Cir. 2005) (defining ratification as an act expressing the sovereign's consent to be bound); *e.g.*, *South Carolina v. Catawba Indian Tribe, Inc.*, 476 U.S. 498, 514 (1986) (Blackmun, J., dissenting) (observing that United States did not consent to 1840 treaty between Catawba Indian Tribe and South Carolina). Plaintiffs offered no support for their theory that the United States became bound by the Andros Order by virtue of *New York's* maintenance of government-to-government relations with the Unkechaug Nation since the 1600s. *See* Br. for Pls.-Appellants (Br.) at 25; *see also id.* at 26-27. New York and the United States are separate sovereigns, and New York's actions do not bind the United States. *See Denezpi v. United States*, 596 U.S. 591, 598 (2022) (citing *United States v. Lanza*, 260 U.S. 377, 382 (1922)). Indeed, the U.S. Department of the Interior has a separate, well-established process for extending federal diplomatic recognition to tribes, and the Unkechaug Nation has not been recognized under this federal process. See *supra*, n.2 (discussing difference between state and federal recognition). If, as plaintiffs claim, an individual State could bind the

United States through the State's own course of dealing, both Congressional ratification and the Department of the Interior's process would be superfluous.

The district court also correctly rejected (SPA 26-27) plaintiffs' unsupported theory that the United States became bound by the Andros Order when the States ratified the Debts and Engagements Clause of the U.S. Constitution.[9] *See* Br. at 24-27. The Debts and Engagements Clause has nothing to do with colonial-era treaties with Native American tribes. Instead, the clause concerns financial commitments undertaken in support of the Revolutionary War during the confederal period. Specifically, the Clause assured "creditors that the adoption of the Constitution would not erase existing obligations recognized under the Articles of Confederation." *Lunaas v. United States*, 936 F.2d 1277, 1278 (Fed. Cir. 1991). Plaintiffs offered no basis to conclude that the Andros Order, an executive

---

[9] The Debts and Engagements Clause provides:

> All Debts contracted and Engagements entered into, before the Adoption of this Constitution, shall be as valid against the United States under this Constitution, as under the Confederation.

U.S. Const. art. VI, cl. 1.

27

order issued by a representative of the English Crown a century before the Revolutionary War, was either an obligation recognized under the Articles of Confederation or a financial commitment.

Indeed, plaintiffs have identified no legal authority involving the Debts and Engagements Clause at all, and rely instead on cases that contravene their theory that the confederal Congress or the United States automatically acceded to all colonial-era agreements with Native American tribes simply by adopting the Articles of Confederation or the Constitution. For example, in *Oneida Indian Nation of New York v. New York*, this Court held that the Articles of Confederation both "confirmed the right of the states to purchase Indian lands within their borders without the consent of Congress," 860 F.2d 1145, 1157 (2d Cir. 1988), and "did not vest the United States with a right of extinguishment with respect to land acquisitions by the states" that had occurred earlier, *id.* at 1162.[10] Indeed, if this Court had held in *Oneida Indian Nation* that

---

[10] Plaintiffs' other cases are inapposite. *Fairfax's Devisee v. Hunter's Lessee* concerned a treaty between the United States and Great Britain ceasing hostilities. *See* 11 U.S. 603, 607-609 (1812). And *Trustees of Dartmouth College v. Woodward* concerned a private charitable institution and the Contracts Clause, not the Debts and Engagements Clause. *See* 17 U.S. 518, 630-31, 638 (1819).

28

the adoption of the Articles of Confederation or the Constitution constituted the federal government's automatic accession to every preexisting agreement between a State and a tribe, there would have been no need to reach plaintiffs' central contention in the case, namely, that a lack of express adoption or consent rendered confederal agreements between New York and the Oneida Nation void ab initio. *See id.* at 1149-50.

> ### 2. The Andros Order unambiguously subjects Unkechaug fishing rights to colonial law and, by implication, its successors.

In any event, even if the Andros Order were federal in nature, there is no merit to plaintiffs' contention that the Order grants the Unkechaug unlimited rights to fish in state waters immune from state fishing regulations. To the contrary, the Andros Order unambiguously subjects Unkechaug fishing rights to laws then in force in the colony of New York and, by implication, its successors, including the laws of New York State.

It is well established that "the interpretation of a treaty is a question of law for the courts." *Georges v. United Nations*, 834 F.3d 88, 93 (2d Cir. 2016) (quotation marks omitted); *see, e.g.*, *Oregon Dep't of Fish & Wildlife v. Klamath Indian Tribe*, 473 U.S. 753, 768 (1985). And in interpreting a Native American treaty, "even though legal ambiguities are resolved to

29

the benefit of the Indians, courts cannot ignore plain language that, viewed in historical context and given a fair appraisal, clearly runs counter to a tribe's later claims." *Oregon Dep't of Fish & Wildlife*, 473 U.S. at 774 (quotation marks and citations omitted); *United States v. Choctaw Nation*, 179 U.S. 494, 535 (1900). Put differently, "[t]he canon of construction regarding the resolution of ambiguities in favor of Indians . . . does not permit reliance on ambiguities that do not exist." *South Carolina,* 476 U.S. at 506.

Here, the district court correctly held that the Andros Order unambiguously grants the Unkechaug the right to fish only in accordance with laws then in force in the colony of New York. (SPA 30; *see* A. 3006-3007.) On its face, the Andros Order grants the Unkechaug the right to fish "according to law and Custome of the Government"; directs colonial law enforcement such as "Magistrates" and "officers" to take note of the order; and permits the Unkechaug to fish provided they are "comporting themselves civilly and as they ought." (A. 3007). This language disposes of plaintiffs' theory that the Andros Order grants the Unkechaug Nation an unlimited right to fish free from all laws other than those the Unkechaug themselves have enacted. *See, e.g.*, *Oneida Indian Nation of*

30

*N.Y. v. New York*, 691 F.2d 1070, 1096 (2d Cir. 1982) (finding plaintiffs'

trust claims insufficient "on their face" because the "language of the treat-

ies clearly amounts to a sale, not a trust").

Indeed, the Supreme Court has interpreted similar language as

authorizing state regulation of tribal fishing activity. For example, in

*People ex rel. Kennedy v. Becker*, the Supreme Court held that treaty

language reserving to a tribe the "privilege of fishing and hunting" on

non-reservation lands did not permit the tribe to fish and hunt "regardless

of the provisions of the game laws of the state of New York."[11] 241 U.S.

556, 560, 562 (1916) (quotation marks omitted). Significantly, the *Becker*

court observed, although the members of the Seneca Nation that had

signed the pertinent agreement approximately 120 years earlier likely

could not have foreseen the specific fishing restrictions that New York

State would eventually adopt, "the existence of the sovereignty of the state

was well understood, and this conception involved all that was necessarily

implied in that sovereignty, whether fully appreciated or not." *Id.* at 563.

---

[11] Contrary to plaintiffs' contentions (Br. at 18-19), *Becker* "remains good law." *See Anderson v. Evans*, 371 F.3d 475, 497 n.22 (9th Cir. 2004) (Gould, J., concurring); *see also Oregon Dep't of Fish & Wildlife*, 473 U.S. at 765 n.16.

Here, likewise, the fishing "law and Custome" of the English colonial "Government" necessarily implied the laws and customs of that government's successors, namely, the State of New York and the United States. Indeed, States are commonly understood to have retained the sovereign authority to regulate fish and wildlife on their state lands. *See Oregon Dep't of Fish & Wildlife*, 473 U.S. at 768-69 (noting that, under Supreme Court precedent, even an express reservation of fishing rights does "not suffice to defeat the State's power to reasonably and evenhandedly regulate such activity"). By contrast, where a treaty specified that a tribe's fishing right "shall not be taken away or in anywise abridged," the Supreme Court held that the language should be "construed to exempt the Indians' preserved rights from like state regulation." *See Antoine v. Washington*, 420 U.S. 194, 196, 206 (1975).

There is no merit to plaintiffs' contention that the Indian construction canon required the district court to interpret the Andros Order as granting the Unkechaug Nation unlimited fishing rights. *See* Br. at 7-11. As the Supreme Court has made clear, the Indian construction canon "does not permit reliance on ambiguities that do not exist." *South Carolina*, 476 U.S. at 506. Nor does the canon permit treaties to

32

"be re-written or expanded beyond their clear terms." *Choctaw Nation of Indians v. United States*, 318 U.S. 423, 432 (1943); *see Oregon Dep't of Fish & Wildlife*, 473 U.S. at 774. Here, the Andros Order contains no language reserving a "special right to be free of state regulation," and a court may not rely on the Indian construction canon to rewrite the document or to supply such language. *See Oregon Dep't of Fish & Wildlife*, 473 U.S. at 774.

Plaintiffs also err in contending (*see* Br. at 18-20) that the Andros Order did not grant them fishing rights, but instead impliedly recognized a purported preexisting right to fish. As an initial matter, the Andros Order's plain language contravenes this interpretation, stating that it is "granting" certain fishing rights to the Unkechaug Nation. (A. 3007.) In any event, whether the Andros Order granted or recognized fishing rights, the Order plainly states that such rights are subject to government laws and customs. (A. 3007.) See *supra* at 30-31.

Also unavailing is plaintiffs' argument that the district court should have relied on *United States v. Washington*, 384 F. Supp. 312 (W.D. Wash. 1974), to interpret the Andros Order. *See* Br. at 19. That case is nonbinding and readily distinguishable. There, the tribe proffered exten-

sive evidence that, when negotiating the (undisputedly federal) treaties at issue, the tribe had "pleaded for and insisted upon retaining the exercise of [fishing] rights as essential to their survival" and were "given unqualified assurance" to that effect by the territorial governor. *Washington,* 384 F. Supp. at 334. Further, there was "neither mention nor slightest intimation" that the territorial government could "qualify, restrict or in any way interfere with the full exercise of those rights." *Id.* Here, by contrast, the summary judgment record contains no similar evidence of unqualified assurances, and the text of the Andros Order expressly qualifies the exercise of fishing rights as being according to the law and customs of the government.

### 3. Plaintiffs' purported expert evidence was irrelevant to the court's legal rulings and did not raise any material dispute of fact.

Plaintiffs miss the mark in arguing that the district court was required to address the testimony of their expert, Dr. Strong, about the Andros Order. *See* Br. at 7-11. "While it is perhaps uncommon for the court to . . . grant summary judgment without any discussion of [an] expert's opinion, 'summary judgment is not *per se* precluded because there'" is an expert opinion. *Dalberth v. Xerox Corp.*, 766 F.3d 172, 189

34

(2d Cir. 2014) (quoting *In re Omnicom Grp., Inc. Sec. Litig.*, 597 F.3d 501, 512 (2d Cir. 2010)). Rather, a district court is free to grant summary judgment where an expert report is not probative of material facts. *In re Omnicom Grp.*, 597 F.3d at 512; *see, e.g.*, *Miller Marine Servs., Inc. v. Travelers Prop. Cas. Ins. Co.*, 197 F. App'x 62, 64 (2d Cir. 2006).

Here, the district court correctly declined to rely on the testimony of Dr. Strong because it was not material to the resolution of this case. Dr. Strong did not offer any testimony relevant to the district court's conclusion that the Andros Order was not federal law. Indeed, Dr. Strong was not asked to—and did not—opine on events occurring after 1676, when any acts of ratification by the United States would have occurred. (A. 2013-2014.)

Dr. Strong's testimony was also irrelevant to the district court's further alternative holding that, even assuming the Andros Order were a treaty, it unambiguously subjects Unkechaug fishing rights to government laws. It is well established that testimony consisting of legal opinion does not create a genuine dispute of material fact for trial. *See Sarkissian Mason, Inc. v. Enterprise Holdings, Inc.*, 572 F. App'x 19, 23 n.5 (2d Cir. 2014). As discussed, the district court determined as a matter

35

of law that the plain meaning of the phrase "law and Custome of the Government" did not support plaintiffs' theory that the Andros Order immunized them from all state regulation. *See South Carolina*, 476 U.S. at 507 (declining to apply Indian construction canon to overcome the "ordinary meaning" of text).

In any event, Dr. Strong's testimony was consistent with the district court's ultimate conclusion that the Andros Order did not grant the Unkechaug Nation fishing rights irrespective of government regulations. *See, e.g.*, *Wilson v. Glenro, Inc.*, 524 F. App'x 739, 741 (2d Cir. 2013) (upholding summary judgment where testimony of plaintiff's own expert supported district court's holding). Dr. Strong nowhere testified that the Unkechaug would have understood the Andros Order to exempt them from all state laws and regulation. To the contrary, Dr. Strong agreed that the Andros Order "grant[ed] the Unkechaug the right to participate in the whaling industry *on the same legal basis* as an English or a Dutch citizen" and opined that securing the right of equal participation "was their goal." (A. 2991-2992 (emphasis added).)

Dr. Strong further testified that the phrase "laws and customs" referred to English laws that could be enforced in a colonial court, and

that the Unkechaug would have understood this. (A. 2988, 2992.) *See Washington State Dep't of Licensing v. Cougar Den, Inc.*, 139 S. Ct. 1000, 1011 (2019) (treaty should be construed as having the meaning that the tribe understood it to have at the time of signing). According to Dr. Strong, such laws and customs included: a prohibition on breaking labor contracts with English or Dutch whaling companies or hiring seamen already contracted to work for such companies; a prohibition on boiling whale oil within a certain distance of the nearest town or homestead; and the observance of certain laws and taxation rates governing "royal" species of fish, such as whales. (A. 1867-1869, 1906-1907, 1911, 2042, 2056, 2994.) Moreover, Dr. Strong testified that he was "certain" that the Unkechaug understood the phrase "comporting themselves civilly and as they ought" to mean that "breaking the laws and customs of the government would result in [the Andros Order] being revoked," or in other consequences including "jail" or "fines." (A. 2053; *see* A. 2050-2052.) As a result, even assuming *arguendo* that expert testimony was relevant to interpret the words "law and Custome of the Government," Dr. Strong's testimony would further reinforce the district court's conclusion that the

37

Andros Order conferred to the Unkechaug Nation a right to fish according to the same government laws and customs that apply to others.

## B. 25 U.S.C. § 232 Is Irrelevant Here.

The district court also correctly concluded that 25 U.S.C. § 232, the sole federal statute identified by the plaintiffs, does not grant the Unkechaug unlimited fishing rights. (*See* SPA 22-23, 25.) As a threshold matter, plaintiffs have abandoned any challenge to this holding on appeal by mentioning 25 U.S.C. § 232 only in a one-sentence footnote in their brief. *See* Br. at 11 n.1. Accordingly, the Court should not consider plaintiffs' statutory preemption argument. *See, e.g.*, *Salahuddin v. Coughlin*, 993 F.2d 306, 308 (2d Cir. 1993) (challenge raised only in footnote was deemed abandoned).

In any event, 25 U.S.C. § 232 is irrelevant because it extends New York's criminal jurisdiction over tribal reservation lands. It does not in any way concern the State's preexisting, plenary jurisdiction over state lands and waters—the only areas at issue here. (*See* SPA 22.) *See United States v. Cook*, 922 F.2d 1026, 1032 (2d Cir. 1991) (interpreting 25 U.S.C. § 232); *Cohen's Handbook of Federal Indian Law* § 6.04[4][a], at 578-580 (Nell Jessup Newton ed., 2012).

38

While States lack jurisdiction over crimes between Native Americans occurring on Native American reservation lands as a matter of federal common law, Congress has from time-to-time expanded States' criminal jurisdiction over such matters. *Cohen, supra,* § 6.04[1], at 530-533; *see Oklahoma v. Castro-Huerta*, 597 U.S. 629, 648-49 (2022). That is precisely what Congress did through 25 U.S.C. § 232. Specifically, Congress granted New York's request for criminal jurisdiction over reservation lands within the State, *see Cohen*, *supra*, § 6.04[4][a], at 579, by expanding New York's criminal jurisdiction to cover "offenses committed by or against Indians on Indian reservations within the State of New York," 25 U.S.C. § 232. *See* H.R. Rep. No. 80-2355, at 1-4 (1948).

Section 232 is thus irrelevant here because it does not concern, much less restrict, New York's ability to enforce state fishing regulations in its own state waters outside of any reservation lands. As the Supreme Court has explained, a jurisdiction-extending statute like 25 U.S.C. § 232 has no bearing on jurisdiction that the State already possessed prior to the statute's enactment. *See Three Affiliated Tribes of Fort Berthold Rsrv. v. Wold Eng'g, P.C.*, 467 U.S. 138, 151 n.11 (1984).

39

## POINT II

### IN THE ALTERNATIVE, THE DISTRICT COURT CORRECTLY DETERMINED THAT NEW YORK'S FISHING REGULATIONS ARE VALID UNDER THE CONSERVATION NECESSITY DOCTRINE

Even assuming *arguendo* that plaintiffs had identified a federal treaty right to fish in state waters without regard to state regulation (which they have not), the Supreme Court has "repeatedly reaffirmed state authority to impose reasonable and necessary nondiscriminatory regulations on Indian hunting, fishing, and gathering rights in the interest of conservation." *Minnesota v. Mille Lacs Band of Chippewa Indians*, 526 U.S. 172, 205 (1999); *see Oregon Dep't of Fish and Wildlife*, 473 U.S. at 765 n.16. Under this "conservation necessity" doctrine, a State's regulation of tribal hunting or fishing is valid and enforceable, even in the face of superior federal rights, provided that the state regulation is (i) nondiscriminatory toward Native Americans and (ii) reasonable and necessary for conservation. *See Mille Lacs*, 526 U.S. at 205; *Herrera v. Wyoming*, 139 S. Ct. 1686, 1695 (2019). Applying the conservation necessity doctrine, the U.S. Supreme Court has upheld state-law restrictions concerning, among other things, "the time and manner of fishing outside the reservation," *Tulee v. Washington*, 315 U.S. 681, 684 (1942), "the size of the take,"

and "the restriction of commercial fishing," *Puyallup Tribe v. Department of Game of Wash.*, 391 U.S. 392, 398 (1968).

Here, the district court correctly concluded that New York's prohibition on glass eel fishing is valid under the conservation necessity doctrine. (*See* SPA 32-33.) First, New York's prohibition is plainly nondiscriminatory because it applies to any person, Native American and non-Native American alike, fishing in state waters. *Compare Anderson v. Evans*, 371 F.3d 475, 498 (9th Cir. 2004) (Gould, J., concurring) (regulations were nondiscriminatory because Native Americans were "not being singled out"), *with Department of Game of Wash. v. Puyallup Tribe*, 414 U.S. 44, 48 (1973) (regulations were discriminatory because they banned fishing gear used by only Native Americans).

Plaintiffs fail to raise any material factual dispute that the regulations are discriminatory by arguing (Br. at 15) that DEC purportedly did not follow internal guidance about cooperating and consulting with Indian Nations (see A. 3206-3211). This guidance was issued ten years after the ASFMC and New York adopted a prohibition on glass eel fishing and in any event has no bearing on whether DEC's regulations purportedly treat members of the Unkechaug Nation *worse* than non-

Native Americans. And it is undisputed that DEC has taken action to enforce the prohibition on glass eel fishing against persons that are not members of the Unkechaug Nation or of any Native American tribe. (*See* A. 4378, 4380.) In any event, the summary judgment record conclusively establishes that DEC attempted to consult with the Unkechaug regarding the glass eel issue, but the Nation rebuffed DEC's outreach. See *supra* at 11. (*See* A. 4327-4328, 4330.)

Second, there is no genuine dispute of material fact that New York's regulations are reasonable and necessary for conservation. As the district court correctly recognized, New York's fishing regulations were enacted pursuant to its obligations under federal law as a member State of the ASMFC, "with the express purpose of conserving the species' population and in response to peer-reviewed findings that American eel numbers were dwindling." (SPA 39; *see* SPA 33.) In particular, ASMFC's stock assessments, the most comprehensive scientific evaluations of the species' health, concluded that the American eel was depleted and that current removals of American eel threatened the ability to maintain the population. (A. 2330-2331.) Indeed, plaintiffs' own summary judgment papers endorsed the ASMFC's conclusion that the eel population was threatened

42

by, among other things, dams, turbines, and parasitic disease, and echoed the ASMFC's observation that a dwindling population of American eel meant that many Native Americans had never seen a live eel. (*See* A. 3105-3106, 3110.)

Plaintiffs err in arguing that isolated excerpts from DEC's expert's deposition create a genuine issue of fact regarding the reasonableness or necessity of New York's prohibition on glass eel harvesting. *See* Br. at 13-14. For example, although eels reproduce only at the end of their lifecycle, it does not follow that a prohibition on harvesting eels early in their lifecycle is unreasonable. A ban on harvesting juvenile eels is reasonable and necessary because, as the summary judgment record establishes, juvenile eels are uniquely vulnerable to bulk harvests that quickly and substantially decrease their numbers. See *supra* at 5. Plaintiffs' own expert, Mr. Moore, testified that a single fisher could catch "hundreds to thousands" of glass eels "during the course of one tide cycle." (A. 4586-4587.) Indeed, plaintiffs' smallest single glass eel harvest contained nearly 22,000 eels. (*See* A. 2817-2818 (estimating 2,900 eels per pound of glass eels).) Moreover, there is a lucrative overseas market for glass eels

43

that does not exist for eels at later stages of their lifecycle.[12] See *supra* at 5-6. Plaintiffs do not explain how a glass eel ban fails to rationally advance the goal of species conservation.

There is also no merit to plaintiffs' argument that the district court was required to consider whether the Unkechaug Eel Management Plan "preserve[s] the American eel better than" New York's regulations. *See* Br. 14-18. The existence of an alternative, untested fishery management plan does not create any genuine issue of material fact as to whether the ASMFC's fishery management plan, which New York's regulations implement, is reasonable. *Cf. Kulak v. City of New York*, 88 F.3d 63, 74 (2d Cir. 1996) (hypothetical alternative treatment plan did not create a genuine issue of fact that physician deviated from standard of care). In any event, no reasonable finder of fact could conclude on this summary

---

[12] Plaintiffs are not aided by their unsubstantiated speculation (Br. at 14) about the eel population being depleted by twenty-five million eels because one million New York residents might each catch twenty-five adult eels—the maximum allowable amount for each recreational fisher. The record contains no evidence that recreational American eel catches along the entire Atlantic coast—much less in New York alone—are remotely likely to approach such enormous numbers. (*See* A. 1596 (annual recreational catches of American eel along entire Atlantic Coast range from 3,500 to 161,000 eels).)

judgment record that plaintiffs' plan is superior. Plaintiffs' plan allows for unlimited harvest of glass eels—the stage of the species that fetches the highest commercial prices and is most vulnerable to exploitation. And plaintiffs offered no admissible evidence that such a plan would increase conservation. Indeed, the record showed that, in Maine, allowing an unlimited catch of glass eels drove exploitation to record numbers. (A. 2342, 2706.)

## POINT III

### PLAINTIFFS' REMAINING ARGUMENTS LACK MERIT

Each of plaintiffs remaining arguments is meritless. *First*, plaintiffs misconstrue the district court's decision in arguing that the court credited the testimony of defendants' expert, Ms. Toni Kerns, without ruling on plaintiffs' motion to exclude her testimony. *See* Br. 11-14. The district court did not rely on Ms. Kerns's declaration for any material fact. Instead, the court relied on ASMFC documents appended to the declaration—documents that were uncontested and on which plaintiffs themselves relied in their own summary judgment papers. (*See, e.g.*, A. 3106, 4111-4114, 4648.) And the district court cited Ms. Kerns's

declaration for only two uncontested matters: the composition of the ASMFC and DEC's prohibition against glass eel fishing.[13]

In any event, the district court's failure to rule on plaintiffs' motion was harmless because that motion articulated no colorable basis to exclude Ms. Kerns's testimony. For example, plaintiffs moved to disqualify Ms. Kerns because she has a master's degree, rather than a doctoral degree, in environmental science. *See* Br. at 12. (*See* A. 1194-1195.) But as plaintiffs themselves acknowledged below in urging the admission of the testimony of Mr. Moore, a doctoral degree is not a prerequisite for the admission of expert testimony. (*See* A. 1747-1748.) And Ms. Kerns's employment with the ASMFC did not render her biased (*see* Br. at 12), because, inter alia, the ASMFC and New York are separate entities that have been adverse in litigation. *See, e.g.*, *New York v. Atlantic States Marine Fisheries Comm'n*, 609 F.3d 524 (2d Cir. 2010).

---

[13] Specifically, the district court cited Ms. Kerns's declaration for the proposition that the ASMFC "is overseen by representatives of the fifteen states bordering the Atlantic Ocean, including New York." (SPA 2 n.1.) And the district court cited Ms. Kerns's declaration for the proposition that New York "promulgated N.Y.C.R.R. §§ 10.1(a) and (b) and 40.1(f) and (i), making it illegal to take or possess American eels less than nine inches long, which includes all juvenile eels, also known as 'glass eels.'" (SPA 4.)

*Second*, plaintiffs incorrectly argue that a remand is required because the district court did not rule on their sweeping motion to compel disclosure of every document in defendants' privilege log. Plaintiffs speculate that some unidentified number of these documents might have provided them with additional evidence. *See* Br. at 21. But a "bare assertion that the evidence supporting a plaintiff's allegation is in the hands of the defendant" is insufficient to defeat summary judgment. *See Contemporary Mission, Inc. v. U.S. Postal Serv.*, 648 F.2d 97, 107 (2d Cir. 1981) (quotation marks omitted). Nor can a party "escape summary judgment merely by vaguely asserting the existence of some unspecified disputed material facts." *Borthwick v. First Georgetown Sec., Inc.*, 892 F.2d 178, 181 (2d Cir. 1989).

Here, plaintiffs have not identified a single privileged document that would plausibly be probative on a material issue of fact, much less articulated why DEC's assertion of privilege over such documents was improper. Moreover, in contrast to the inapposite cases on which plaintiffs rely, there is no indication here that any portion of the district court's holding improperly rested on privileged material. *Cf. Association for Reduction of Violence v. Hall*, 734 F.2d 63, 67 (1st Cir. 1984) (reversing

47

where "the district court apparently relied on documents which it had previously determined to be privileged").

*Third*, there is no merit to plaintiffs' argument (Br. 22-24) that the district court took out of context Chief Wallace's deposition testimony about the boundaries of the Unkechaug's customary fishing waters, where plaintiffs seek unlimited fishing rights. This argument is irrelevant because the court clearly stated that its summary judgment opinion did not rest on any determination of the boundaries of the Unkechaug's customary fishing waters. (*See* SPA 25.) Instead, its determination rested on the fact that the Andros Order unambiguously provides that Unkechaug fishing rights in state waters—whether or not the Nation has customarily fished in such waters—are subject to state law. (SPA 29-32.)

In any event, contrary to plaintiffs' contentions (*see* Br. 22-24), Chief Wallace testified that the Unkechaug Nation's customary fishing waters extended to everywhere the fish travel. For example, when asked "What are the extent of the traditional waters that you claim the Unkechaug have the unlimited right to fish?" Chief Wallace responded, "Where the fish travel." (A. 2930; *see* A. 2967 (confirming same answer in Fed. R. Civ. P. 30(b)(6) deposition on behalf of Unkechaug Nation).) Chief

Wallace continued that these waters included the whole shore of Long Island, the Hudson River, and Lake Ontario, among other bodies of water. (A. 2930-2931.)

*Last*, plaintiffs have abandoned their challenge to the district court's dismissal of their First Amendment claim by raising only a passing argument in a footnote. *See* Br. at 12 n.2; *Salahuddin*, 993 F.2d at 308. Regardless, the district court correctly granted summary judgment on this claim. (*See* SPA 36-39.) Plaintiffs adduced no evidence that "the purpose of the defendants' challenged actions was to impugn [plaintiffs'] religious beliefs or to restrict their religious practices," *see Skoros v. City of New York*, 437 F.3d 1, 39 (2d Cir. 2006). Indeed, as explained supra at 41-42, New York's prohibition on glass eel harvesting is generally applicable and has been enforced against individuals who are not members of the Unkechaug Nation or any other Native American nation. Moreover, the summary judgment record unequivocally establishes that New York adopted its prohibition on glass eel harvesting pursuant to its federal-law obligations as a member of the ASMFC and in furtherance of conservation. (*See* SPA 38-39.) And plaintiffs proffered no evidence that glass

49

eels are used in Unkechaug ceremonial or religious practice.[14] (*See* A. 1046, 1098 (describing Unkechaug customs as involving only yellow eels, which are legal to harvest).)

## POINT IV

### THIS COURT MAY ALTERNATIVELY AFFIRM THE JUDGMENT ON OTHER GROUNDS APPEARING IN THE RECORD

This Court may affirm a district court's grant of summary judgment "on any ground which finds support in the record, regardless of the ground upon which the trial court relied." *Sudler v. City of New York*, 689 F.3d 159, 178 (2d Cir. 2012) (quotation marks omitted). Here, the district court's grant of summary judgment may be affirmed on any of three alternative grounds raised by defendants below—that plaintiffs' claims are (i) precluded by res judicata, (ii) barred under the Eleventh Amendment;

---

[14] Plaintiffs originally alleged that DEC regulations prohibiting the dumping of debris or fill into tidal wetlands interfered with their First Amendment rights to make wampum from seashells. As the district court correctly observed, plaintiffs subsequently abandoned this theory at summary judgment. (*See* SPA 38.) And the summary judgment record unequivocally establishes that returning natural products of tidal wetlands (such as shells) back into those wetlands does not violate state law. *See* ECL § 25-0401(3). (*See* A. 2782-2783.)

or (iii) time-barred by *City of Sherrill v. Oneida Indian Nation of N.Y.*, 544 US. 197 (2005).

## A. Res Judicata Bars Plaintiffs' Claims Here.

This Court may uphold the district court's grant of summary judgment in its entirety on the alternative grounds that res judicata bars plaintiffs' claims. A federal court "must give to a state-court judgment the same preclusive effect as would be given that judgment under the law of the State in which the judgment was rendered." *Migra v. Warren City Sch. Dist. Bd. of Educ.*, 465 U.S. 75, 81 (1984); *accord Cloverleaf Realty of N.Y., Inc. v. Town of Wawayanda*, 572 F.3d 93, 95 (2d Cir. 2009). Under New York law, res judicata "bars successive litigation based upon the same transaction or series of connected transactions" where: (i) a court of competent jurisdiction has rendered a judgment on the merits, and (ii) there is identity or privity of parties. *Matter of People v. Applied Card Sys., Inc.*, 11 N.Y.3d 105, 122 (2008) (quotation marks omitted). Because New York applies a transactional test for res judicata, the doctrine "applies not only to claims actually litigated but also to claims that could have been raised in the prior litigation," *Matter of Hunter*, 4 N.Y.3d 260,

269 (2005), "even if based upon different theories or if seeking a different remedy," *O'Brien v. City of Syracuse*, 54 N.Y.2d 353, 357 (1981).

Res judicata bars plaintiffs' claims here. The Unkechaug Nation brought a lawsuit against DEC in state court in 2016, based on many of the same facts and arguments as plaintiffs' current lawsuit.[15] For example, in the state-court lawsuit, as here, the Unkechaug Nation challenged DEC's seizure of glass eels as unlawful, under a theory that "the Unkechaug are immune from any jurisdiction of the New York State Department of Environmental Conservation." (A. 2825.) And in the state-court lawsuit, as here, the Unkechaug Nation alleged that DEC had deprived it of rights and sovereignty and interfered with its religious practices. (A. 2828.)

Moreover, the state-court lawsuit was dismissed on the merits even though the state court did not explicitly say so. Contrary to the district

---

[15] Although Chief Wallace was not a named plaintiff in the state-court lawsuit, he was in privity with the named plaintiff (the Unkechaug Nation) because his "participation amount[ed] to a sharing in control of the litigation," *Watts v. Swiss Bank Corp.*, 27 N.Y.2d 270, 277 (1970). (*See* A. 2900-2902, 5402 (declaration from Chief Wallace describing personal role in 2016 litigation), 2837-2839 (affidavit from Chief Wallace submitted in 2016 litigation).)

court's conclusion here (*see* SPA 20), under New York law, an order need not expressly state that it is dismissing "on the merits" or "with prejudice," so long as it "appears from the judgment that the dismissal was on the merits," *Strange v. Montefiore Hosp. & Med. Ctr.*, 59 N.Y.2d 737, 738 (1983).[16] Here, DEC moved for dismissal of the state-court lawsuit on the ground that plaintiffs had failed to substantiate their claims of immunity and interference with religious practice (*see* A. 2872-2873), and the state court dismissed the claims for injunctive relief for failure to state a claim (A. 2907). Moreover, the state court evidently denied plaintiffs' motion to allow them to withdraw the action without prejudice to refiling in federal court. (*See* A. 2907.) Plaintiffs thus are barred from bringing the same claims of immunity against the same defendant in the current, subsequent lawsuit.

---

[16] *See, e.g.*, *Terry v. Incorporated Vill. of Patchogue*, 826 F.3d 631, 633 (2d Cir. 2016) (granting preclusive effect to state-court decision in *Terry v. Incorporated Vill. of Patchogue*, 23 Misc. 3d 1118(A), 2009 N.Y. Slip Op. 50818(U) (Sup. Ct. Suffolk Cnty. 2009)).

**B.    The Eleventh Amendment Bars This Lawsuit.**

Under the Eleventh Amendment, "states are protected from defending in federal court against actions brought by Indian tribes." *Western Mohegan Tribe & Nation v. Orange Cnty.*, 395 F.3d 18, 21 n.2 (2d Cir. 2004); *see Blatchford v. Native Vill. of Noatak*, 501 U.S. 775, 782 (1991). A tribe's lawsuit against a State "is barred by [the State's] Eleventh Amendment immunity unless it falls within the exception [the Supreme Court] has recognized for certain suits seeking declaratory and injunctive relief against state officers in their individual capacities." *Idaho v. Coeur d'Alene Tribe of Idaho*, 521 U.S. 261, 269 (1997) (citing *Ex parte Young*, 209 U.S. 123 (1908)). Plaintiffs' claims here do not fall within the *Ex parte Young* exception.

**1.    The *Coeur d'Alene* doctrine bars plaintiffs' claims.**

*Idaho v. Coeur d'Alene Tribe of Idaho* bars plaintiffs' claims because their suit functionally seeks to "divest the State of its sovereign control" over public lands. *See* 521 U.S. at 283. Here, plaintiffs seek a permanent injunction barring DEC from "any attempts . . . to enforce the civil or criminal laws" of New York against the Unkechaug Nation, its members, or its employees for exercising their fishing rights. (*See* A. 26.) Plaintiffs

54

also seek a declaration that there is "no limitation on the Unkechaug's fishing right except by what the Unkechaug place" and that "New York State doesn't have the right to" enforce any fishing regulations against the Unkechaug. (*See* A. 2927; *see also* A. 2928 (Q: "So could the state pass any law or regulation that would apply to the Unkechaug's fishing?" A: "No.").)

Moreover, the course of this litigation has made clear that the Unkechaug seek to replace New York's jurisdiction over the American eel with exclusive Unkechaug jurisdiction. (*See* A. 2965-2966, 3002, 4176-4177.) Plaintiffs have already purported to license not only members of the Unkechaug Nation but also other individuals to fish for glass eels in state waters, in violation of state law. (A. 2966, 3002, 4542.) In addition, plaintiffs' expert, Mr. Moore, testified that plaintiffs intend to replace parts of the ASMFC's fishery management plan in New York with the Unkechaug eel management plan. (*See* A. 1102-1103.) The Unkechaug eel management plan, which contains no geographic restrictions, prohibits all eel fishing—including all fishing for adult eels, both recreational and commercial—except as provided in the plan, and prohibits anyone other than an enrolled member of the Unkechaug Nation from receiving a

55

permit to fish for glass eels commercially. (A. 4094-4105; *see also* A. 1781.) As this Court has observed, the Eleventh Amendment bars plaintiffs from seeking a "divestiture of the state's broad range of controls over its own lands." *Western Mohegan Tribe*, 395 F.3d at 23 n.4 (quotation marks omitted). Moreover, plaintiffs' lawsuit challenges the State's regulatory authority over its submerged lands and navigable waters, which "uniquely implicate sovereign interests," *Coeur d'Alene*, 521 U.S. at 284.

Contrary to the district court's conclusion, this Court's decision in *Silva v. Farrish*, 47 F.4th 78 (2d Cir. 2022), involved narrower claims than those asserted here. In *Silva*, the Court found that the *Coeur d'Alene* doctrine did not bar "the plaintiffs' individual claims that they have their own right to fish" in the Shinnecock Bay. *Id.* at 85. Critically, the Court explained that the individual *Silva* plaintiffs did not seek "to invalidate the regulatory authority of the state agencies" over the waters at issue, and explained that, even if the Court were to grant the relief the plaintiffs sought, the waters would "continue to be subject to the state's regulatory authority." *See id.* at 85-86 (quotation and alteration marks omitted). Here, by contrast, plaintiffs seek to immunize the Unkechaug Nation, its

56

members, and its employees from state regulation and to have the Unkechaug Nation's fishing management plan govern.

### 2. The *Pennhurst* doctrine bars plaintiffs' claims regarding the Andros Order.

*Pennhurst State School & Hospital v. Halderman*, 465 U.S. 89 (1984), poses an independent Eleventh Amendment bar to plaintiffs' claims based on the Andros Order. It is well settled that *Ex parte Young* does not apply to suits against state officials on the basis of state law. *Pennhurst*, 465 U.S. at 100, 106; *Libertarian Party of Conn. v. Lamont*, 977 F.3d 173, 181 n.3 (2d Cir. 2020). As discussed, Native American treaties with colonies, such as the Andros Order, may at most "be recognized as a matter of state law." *Restatement of the Law–The Law of American Indians*, *supra*, § 5 cmt. h (colonial treaties are "not treaties entitled to status under the Supremacy Clause"). Thus, the Eleventh Amendment bars this federal court from entertaining claims for injunctive relief against New York officials based on the Andros Order. *See, e.g.*, *Santee Sioux Tribe of Neb. v. Nebraska*, 121 F.3d 427, 432 (8th Cir. 1997) (*Pennhurst* barred tribe's suit against state official for violation of state law); *see also Fond du Lac Band of Chippewa Indians v. Carlson*, 68 F.3d

253, 256 (8th Cir. 1995) (noting that sovereign immunity would bar tribe's suit against state officials "seeking to enjoin violations of *state* law").

## C.   The *Sherrill* Doctrine Bars Plaintiffs' Claims.

Plaintiffs' attempt to judicially enforce rights they claim under the 350-year-old Andros Order is also time-barred under *City of Sherrill v. Oneida Indian Nation of N.Y.*, 544 US. 197 (2005). In *Sherrill*, the Oneida Nation asserted that parcels of reservation land sold to non-Native landowners between 1795 and 1805, and repurchased by the Oneida Nation in 2000, were exempt from taxes because the original sales violated a 1790 federal law and 1794 federal treaty. *Id.* at 202-05. The Supreme Court rejected the tribe's attempts to litigate the sovereign character of the parcels after two centuries. *Id.* at 214.

*Sherrill* bars plaintiffs' suit here. Like the Oneida Nation, which did not assert its legal theory for 200 years, *see id.* at 216, the Unkechaug Nation did not assert its legal theory that it was immune from all state regulation of fishing for 350 years, until 2016. (*See, e.g.*, A. 4195, 4327-4328, 4374.) Moreover, like the Oneida, the Unkechaug have long recognized New York's exercise of sovereignty over its own state waters. DEC

and the Unkechaug worked collaboratively for years to ensure that members of the tribe could obtain free licenses from New York to fish in state waters, and members of the Unkechaug, including Chief Wallace, routinely applied for such licenses. (*See* A. 2779; *see, e.g.*, A. 2785-2787.) Accepting plaintiffs' theory of a longstanding, broad-based immunity from state law now would be highly disruptive. *See, e.g.*, *Cayuga Indian Nation of N.Y. v. Village of Union Springs*, 390 F. Supp. 2d 203, 206 (N.D.N.Y. 2005) (denying claim for immunity from state and local zoning laws and regulations under *Sherrill*); *Seneca-Cayuga Tribe of Okla. v. Town of Aurelius*, 233 F.R.D. 278, 281-2 (N.D.N.Y. 2006) (same).

## CONCLUSION

For any and all of the foregoing reasons, this Court should affirm

the district court's grant of summary judgment.

Dated:  New York, New York
        March 25, 2024

Respectfully submitted,

LETITIA JAMES
  *Attorney General*
  *State of New York*
Attorney for Appellees

By:  */s/ Elizabeth A. Brody*
ELIZABETH A. BRODY
Assistant Solicitor General

BARBARA D. UNDERWOOD                 28 Liberty Street
  *Solicitor General*               New York, NY 10005
JUDITH N. VALE                       (212) 416-6167
  *Deputy Solicitor General*
ELIZABETH A. BRODY
  *Assistant Solicitor General*
    *of Counsel*

## CERTIFICATE OF COMPLIANCE

Pursuant to Rule 32(a) of the Federal Rules of Appellate Procedure, Emily Paule, an employee in the Office of the Attorney General of the State of New York, hereby certifies that according to the word count feature of the word processing program used to prepare this brief, the brief contains 11,725 words and complies with the typeface requirements and length limits of Rule 32(a)(5)-(7) and Local Rule 32.1.

*/s/ Emily Paule*